IN THE MATTER OF STEPHEN L. ELLSWORTH, AN
ATTORNEY AT LAW.

February 4, 1985.

ORDER

This matter having come before the Court on an Order to
Show Cause why STEPHEN L. ELLSWORTH of MAGNOLIA

should not be disbarred or otherwise disciplined for his violations of *DR* 1–102(A)(3), (4) and (6), *DR* 2–106(A), *DR* 6–101(A)(1) and (2), *DR* 6–102(a) and *DR* 7–101(A)(1) and (2), and said STEPHEN L. ELLSWORTH having failed to appear before this Court on the return date of said Order to Show Cause, and good cause appearing;

It is ORDERED that the report of the Disciplinary Review Board recommending that respondent be disbarred is hereby adopted; and it is further

ORDERED that STEPHEN L. ELLSWORTH be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that STEPHEN L. ELLSWORTH be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that STEPHEN L. ELLSWORTH reimburse the Ethics Financial Committee for appropriate administrative costs.

## *Report of the Disciplinary Review Board*

This matter is before the Board based upon three presentments filed by the District IV (Camden County) Ethics Committee.

Respondent is charged with endorsing and cashing a check made payable to his employer without authorization; fraudulently obtaining property, using it for his own benefit and deceiving the owner concerning promised payments, contrary to *DR* 1–102(A)(3), (4) and (6); neglecting a legal matter entrusted to him, exhibiting a pattern of negligence in handling legal affairs, failing to carry out a contract of employment and receiving a retainer while knowing he would not perform legal services, contrary to *DR* 1–102(A)(4) and (6), and 7–101(A)(2).

He also is charged with attempting to compromise ethics complaints, contrary to DR 6–102(A).

The charges are summarized as follows:

### 1. JOSEPHSON BAR REVIEW

While a law student, Respondent was employed as the campus coordinator for Josephson Bar Review (JBR) at Delaware Law School. He would receive enrollment applications from law students for the JBR course and forward the money to the company. He did not have authorization to cash checks.

He received a check dated June 14, 1979 for $325 from a law student as an enrollment fee for the course. Instead of forwarding this check to the JBR office, he endorsed it and deposited the money in his personal account. JBR later learned of this when the student sought to transfer his course enrollment from summer 1979 to winter 1980. When asked by JBR for an explanation, Respondent replied by letter dated May 14, 1980 that he had accidentally cashed the check and put the money into his own account. He reimbursed JBR for the full amount, but included on the check endorsement that it was in full satisfaction of all claims and liabilities. JBR did not cash the check.

When the matter was first considered by the Ethics Committee in 1982, Respondent challenged the Committee's jurisdiction to hear the case since he was not an attorney at the time. The Ethics Committee agreed with him. The Division of Ethics and Professional Services appealed to this Board which reversed and remanded the matter. Neither the complainant nor Respondent appeared at the Ethics Committee hearing on August 22, 1983. Respondent had filed an answer to the complaint in which he stated that the check was accidentally deposited into his account when he was operating the Bar Review office out of his house. The Ethics Committee concluded that Respondent knowingly endorsed the check and knowingly used the proceeds for his own benefit.

## 2. SHUTE COMPLAINT

Gloria and James W. Shute owned a home at 437 West Evesham Avenue, Magnolia, New Jersey which they had been trying to sell for two years. Mrs. Shute, a professional comedienne, was anxious to sell the house and move to California. While they had several offers, they all fell through.

In September 1980, Respondent approached Mrs. Shute and inquired as to the selling price of the house. When she told him that it was $62,000, he asked her when the contract with the realtor would expire. He was told that it would end in two weeks. He said he would return after that time. They then could talk about the sale of the house without a realtor. Respondent, another man and two women later came to the house. Mrs. Shute informed Respondent that the house had been appraised at $62,000. Respondent offered to buy the house for the existing mortgage of $28,500 and $22,000 in cash. When Mrs. Shute argued that the sale price would then be only $50,000, Respondent said that she would save on real estate fees, other charges, attorney fees (because he was an attorney) and on paperwork. Mrs. Shute doubted that Respondent could assume the mortgage, but he told her that it was possible since he had contacts at the bank and was aware of different legal loopholes. Respondent told Mrs. Shute that a zoning variance would have to be obtained so that he could practice law as well as reside there.

The Shutes accepted Respondent's offer. Under the agreement, Respondent would seek to obtain a variance by November 1980 and pay them $22,000 in either cash or check. Respondent was to pay the Shute mortgage and the property taxes. The Shutes would continue to claim the mortgage interest deduction on their income tax return. Mr. and Mrs. Shute and their two children moved out of the house and into an apartment; Respondent moved into the house. No down payment was made. He later informed her that the Zoning Board of Adjustment could not consider the matter at its November

meeting because property owners within 200 feet had not been notified. He told her that he had sent out the notification letters, but when Mrs. Shute checked with a neighbor-friend, no letter had been received. Before the December 1980 Zoning Board meeting, Mrs. Shute checked with her neighbor-friend again to determine if the notification letters had been sent. Again the neighbor said she had not received one.

Mrs. Shute experienced difficulty contacting Respondent. He did not return her telephone calls. One day, she hid around the corner from her former house and waited for Respondent to pull up in his car. She then went to the door, knocked and went in. Respondent was dining with another man and two women. Respondent told her that he would give her $10,000 and the balance when the property was rezoned. Mrs. Shute told him that she was not going to re-sign the agreement of sale when it expired in January. She complained that it did not seem that Respondent was ever going to appear before the zoning board. Respondent replied that she did not have to re-sign anything because the deed was already signed over to him. She demanded a copy of the document, but he replied that he did not have one. Respondent and his friends were laughing as Mrs. Shute left the house. This was the first time that she realized she had signed a deed to Respondent. The deed was signed by the sellers on November 12, 1980 and recorded in the Camden County Clerk's office on November 19, 1980.

Subsequently, Mrs. Shute told her husband that she could no longer delay going to California and that he would have to take care of things in New Jersey. She left for California on January 7, 1981. Mr. Shute also was unsuccessful in contacting Respondent. He had to resort to using fictitious names in order to speak with Respondent who would not be available if he knew Mr. Shute was on the telephone. During a telephone call in January, Respondent promised Mr. Shute that he would have the money by the end of the month. In February, Respondent promised Mr. Shute he would have the money that month. In a later conversation, Respondent said the money

would be available in March. In April, Respondent told Mr. Shute that if he wanted the money, he would have to sue for it. When Mr. Shute said he could not understand how Respondent could practice law in the house if the property was not zoned commercial, Respondent replied:

The worse that, that can happen, they'll send me some nasty letters and tell me I'm not allowed to do it.... They can't really stop me, anyway; if they did, I can make a lot of trouble for other people in this town who have commercial properties without being zoned properly [GST 17–11–17].[1]

Mr. Shute contacted his wife in California and informed her of his conversations with Respondent. They then contacted an attorney in North Jersey and a suit was filed against Respondent. When Respondent learned of the lawsuit, he stopped making the mortgage payments. In a settlement agreement, Respondent, in addition to paying off the Shutes' mortgage, agreed to pay the Shutes $26,000, which included legal fees and costs. At Respondent's insistence, the Shutes signed a release, which included any ethics complaints. Respondent asserted this purported release from ethical complaints as an affirmative defense in his answer to the ethics complaint. See C–2 in Evid. in GST file.

When they vacated their home, the Shutes left a piano which could not be fitted into an apartment. When the settlement was placed on the record, Respondent, in response to questions by Mrs. Shute's attorney, stated that there was no piano in the basement. At some earlier time, Respondent would not allow Mrs. Shute's brother into the house to move the piano. On the day after the settlement agreement, Mrs. Shute looked into the basement window and saw the piano there exactly where she had left it.

On November 17, 1981, Mr. and Mrs. Shute filed an ethics complaint against Respondent charging that Respondent violated *DR* 1–102(A)(4) and (6) in that he engaged in conduct

---

[1]GST refers to transcript of Ethics Committee Hearing of *Gloria Shute v. Stephen Ellsworth,* Docket # IV–81–36E, of August 22, 1983.

involving dishonesty, fraud, deceit and misrepresentation and engaged in other conduct that adversely reflected on his fitness to practice law. Respondent filed an answer to the complaint which, in part, attacked the complainant's character and credibility. At the Ethics Committee hearing, Mrs. Shute denied Respondent's statement that he told her to obtain her own attorney. She maintained that Respondent told her that he would be her attorney and that she would therefore save money. She acknowledged that she used stage names because she was a comedienne, but denied Respondent's contention that she used an alias to avoid indebtedness or to defraud. Respondent did not appear at the Ethics Committee hearing.

The Ethics Committee found that Respondent had obtained possession of property by fraud and that the Shutes were not aware that they had conveyed the property to him. It also found that when Respondent acquired the property, he had no intention of paying the Shutes. It concluded that Respondent treated the Shutes with disdain and considered the entire matter in a cavaliere and truly unprofessional manner.

### 3. DE VRIES COMPLAINT

Dorothy and Norman DeVries of Williamstown contacted Respondent in September 1982 regarding child support costs which Mr. DeVries was obligated to pay. Initially, the DeVries had tried to resolve this matter with the Probation Department themselves. They finally decided that since $2,000 was involved, they should have an attorney. Both were unemployed at that time and had no money. They saw an advertisement in the telephone book by Respondent which advertised free consultation and time payments. After the initial meeting, Respondent told them that he would only proceed with the matter after he received a $500 retainer. They signed an agreement on September 17, 1982. Respondent received two payments of $100 on September 17 and on October 6. He was paid the balance of $300 on November 5, 1982. Respondent was to draft and file an action to terminate or reduce the support payments

and to attend the court hearing. At their September meeting, Respondent told the DeVries that he did not like people calling his office and pestering him. He told them that he would do his job. Consequently, they did not call him.

The DeVries waited to be called, but heard nothing from Respondent. In December 1982, they attempted to contact him and did make contact with him the week before Christmas. He told them that he had all the information necessary, except some information concerning one son, and he was waiting to hear from the probation office. He said that he would give that office two more weeks to answer. The DeVries next contacted Respondent on January 3, 1983. He informed them that he was not going to wait any longer for the probation report and would file the action on January 6. On several occasions, Mrs. DeVries attempted to contact Respondent, but instead got his answering service. During one call, she spoke with Respondent's secretary and left a message for Respondent to call her. He did not return the call. She called again a few days later and left a message with Respondent's secretary that if Respondent did not take care of the matter, that he should return the retainer.

The DeVries met with Respondent in April 1983. Respondent showed them a paper that he said he received from the probation department which showed the support payments they had made. He added, however, that the document did not give him all the information he needed for 1979, 1980 and 1981. He promised them that he would write again to get this information. Mrs. DeVries, however, felt that Respondent was not doing anything regarding this matter. She told him if he did not want to handle the matter, to return the $500. Respondent answered that he would return all but $150, but Mrs. DeVries would not accept this. When she told him that she had notified the Ethics Committee, he demanded that they leave his office. As they were leaving, Respondent said "have fun" and laughed. At the time of the Ethics Committee hearing in August 1983, the matter still had not been resolved.

Respondent did not appear at the Ethics Committee hearing. After hearing testimony, the Ethics Committee concluded that Respondent had neglected a legal matter entrusted to him, exhibited a pattern of negligence in handling legal matters, failed to carry out a contract of professional employment, and received a $500 retainer knowing that he would not perform legal services and would neglect the matter.

## CONCLUSION AND RECOMMENDATION

Upon a review of the full record, the Board is satisfied that the conclusions of the Ethics Committee in finding Respondent guilty of unethical conduct are fully supported by clear and convincing evidence.

Concerning the Josephson Bar Review complaint, the Board agrees with the Ethics Committee that the evidence clearly establishes that the Respondent knowingly endorsed the check for $325 and used the proceeds for his own use in violation of *DR* 1–102(A)(3), (4), and (6). Although this matter occurred before Respondent's admission to the bar in 1979, this complaint is material and relevant in the determination of this matter. See *In re Bogart,* 9 *Cal.*3d 743, 511 *P.*2d 1167, 108 *Cal.Rptr.* 815, (Sup.Ct.1973). Such conduct evidences a lack of moral fiber that cannot be tolerated in a member of the bar.

In the Shute matter, the Board finds that Respondent violated *DR* 1–102(A)(4) in obtaining the Shute property by conduct involving dishonesty, fraud, deceit or misrepresentation. He deceived the Shutes into signing the property deed to him when they thought they were simply signing an agreement of sale. Respondent had promised to pay them $22,000, but continually avoided paying them on the pretext that he had not obtained zoning board approval to use the property for commercial purposes. After stalling them for six months, he told them that they would have to sue him for the money. The evidence clearly establishes that he never intended to honor his obligation. Respondent's egregious conduct in this matter was total-

ly amoral. Here, he utilized his professional skill as an attorney to deliberately defraud and injure the Shutes. His actions violated every precept governing the ethical practice of law.

Moreover, the Board is seriously disturbed by the practice of this Respondent of having his clients sign a release to purportedly exempt him from ethical charges. This clearly violates the intent of *DR* 6–102(A).

In the DeVries matter, Respondent deliberately intimidated his clients from contacting him to determine the status of their legal problem. When they did attempt to contact him, he did not return their telephone calls. Only after seven months were they able to arrange another meeting with him, at which time they discovered that he had done nothing.

To accept a retainer under circumstances where the attorney knows, or should know, that the legal services for which he was retained will not be performed is clearly unethical. *In re Stern*, 92 *N.J.* 611, 619 (1983). The Board finds that Respondent failed to carry out a contract of professional employment with the DeVries. *DR* 7–101(A)(2). His conduct with the DeVries adversely reflects on his fitness to practice law. *DR* 1–102(A)(6).

In addition to these three complaints, eight others had been lodged against Respondent in three presentments filed by the District IV Ethics Committee. This Board in 1983 found the following violations:

1. Overreaching of two clients by charging and collecting excessive fees. *DR* 2–106(A);

2. A pattern of neglect in six cases. *DR* 6–101(A)(2);

3. Gross negligence in five cases. *DR* 6–101(A)(1);

4. Misrepresentation of the status of cases to clients. *DR* 1–102(A)(4) and (6);

5. Failure to seek the lawful objectives of clients in three cases. *DR* 7–101(A)(1);

6. Failure to carry out contracts of employment. *DR* 7–101(A)(2); and

7. Attempts to compromise ethics complaints in three cases. *DR* 6–102(A).

After considering these eight cases, this Board withheld a recommendation of a specific penalty because other complaints

were then pending against Respondent. The Board recommended the immediate temporary suspension of Respondent pending resolution of the remaining complaints. The Supreme Court ordered his temporary suspension on September 7, 1983 and continued it on September 20, 1983.

Respondent's conduct was not aberrational. There is a distressing pattern to his actions. From the outset of his legal career in 1979, Respondent forgot or never learned the high purpose of the legal profession. He placed his interests above those of his clients. He sought to gain at the expense of his clients. Respondent's conduct demonstrates an "insensitivity to the mandate of the Disciplinary Rules." *In re Surgent*, 79 *N.J.* 529, 535 (1979). The public must be protected from further serious transgressions by this Respondent. *Matter of Dailey*, 87 *N.J.* 583, 594 (1981).

Based on the totality of the circumstances, the Board recommends that Respondent be disbarred. There are no mitigating factors. Respondent is wholly unfit to be a member of the bar.

The Board further recommends that Respondent be required to reimburse the Ethics Financial Committee for appropriate administrative costs. ·