IN THE MATTER OF ROBERT S. STERN, AN ATTORNEY AT LAW.

Argued January 25, 1983—Decided May 4, 1983.

612

*Colette A. Coolbaugh,* Secretary, argued the cause for complainant Disciplinary Review Board.

*Matthew R. McCrink* argued the cause for respondent (*McCrink & Nelson,* attorneys).

PER CURIAM.

After considering three complaints against respondent, the District IV Ethics Committee for Camden and Gloucester Counties issued a presentment. The Disciplinary Review Board (Board) agreed that respondent had engaged in unethical conduct. After a hearing, the Board recommended that respondent be suspended for a period of three years; that his readmission be conditioned upon successful completion of a Skills and Methods training course or similar courses concerning legal ethics, legal accounting and New Jersey practice; and that his readmission be limited to practice with a law firm in which respondent would receive adequate supervision and training. The Board directed reimbursement for administrative costs.

Our independent review of the entire record leads us to the conclusion that respondent has been guilty of unethical conduct in the matters charged. However, it is our view that a one year suspension with the conditions stated appropriately reflects the seriousness of respondent's misconduct and will adequately protect the public.

### I—Chelano Matter

Respondent initially represented Chelano in connection with a claim for the value of a stolen motor vehicle against his insurer. Their initial conference in September of 1981 covered the insurance claim and other legal matters including a possible bankruptcy petition and medical malpractice action.

Respondent negotiated a $6,517 settlement of the auto claim. He invested considerable personal effort. On November 18, 1981, respondent drove to Murray Hill and picked up a check in the amount of $3,305 made out to a creditor bank to satisfy the

bank's lien on the vehicle. On the following day, respondent and Chelano drove again to Murray Hill and picked up the remaining proceeds of the settlement in the form of a $1,500 cashier's check made to the order of Chelano and his wife and a check for $1,711.70, payable to Chelano, his wife, and the respondent. Chelano was in pressing need of funds. He took the $1,500 check immediately and endorsed the $1,711.70 check, signing both his name and that of his wife. (His wife has raised no objection to this procedure and it is not part of the ethical complaint against respondent.) Chelano gave the $1,711.70 check to respondent, who deposited it in his attorney account. The principal dispute centers about the disposition of these proceeds. Chelano claims that he was entitled to everything except for a $600 fee. Respondent claimed he was entitled to a $1,000 fee.

Respondent, acting pursuant to this understanding, on November 24, 1981 withdrew $750 in cash, which he calculated was due to Chelano after various deductions for gas and expenses and a credit of $50 paid on the $1,000 fee. Respondent claimed that he attempted to reach Chelano to give him the $750 but was unable to do so. A bizarre chain of circumstances followed. Having been advised by Chelano that he wanted payment only in cash, respondent found himself in the possession of $750 in cash when he had to leave for Florida, on November 26, to assist his ill mother. He took the cash with him to Florida where he had his mother place it in a safe deposit box held jointly in his and his mother's names. He returned with the cash in mid-December. The funds were, however, not paid to Chelano at that time. Chelano claimed that repeated efforts to reach the respondent were unsuccessful and that he had to get respondent's wife to type a letter that could be presented to a bank to enable Chelano to obtain a loan to tide him over. The letter, dated December 22, 1981, stated that Chelano was owed $1,500 less attorney's fees pursuant to a settlement of a claim with Allstate and would receive the funds within 30 days. On the strength of this letter Chelano obtained a $1,000 loan for a 30-day period.

Respondent, on the other hand, contended that when he returned from Florida, Chelano wanted action to be taken on other pending matters and that Chelano initially agreed to utilization of the money by respondent to pursue these other cases; thus the loan. Respondent actually arranged with the bank for a 6-month extension of Chelano's loan. Notwithstanding the loan extension, Chelano still called, leaving messages with respondent's wife and mother-in-law demanding the money. Respondent said that he was unable to reach Chelano in return and gave the money to his mother-in-law to place in her safe deposit box. The $750 that respondent admits belongs to Chelano was not paid over to the client until June 9, 1982, following conclusion of the District Committee's hearing.

## II—Aguilar Matter

Respondent agreed to represent Aguilar in a divorce action. The agreed fee was $375 plus $200 costs. A $200 retainer was given to respondent in cash in November 1981. Respondent did not take any action with regard to Aguilar's divorce. At a hearing before the Disciplinary Review Board he stated that he delayed action on the divorce because Aguilar was having immigration problems. Respondent attempted to remedy these problems, ostensibly without charge. The $200 paid by Aguilar to respondent and deposited by respondent in his business account was utilized by respondent in the general conduct of his practice on behalf of other clients.

## III—Mondello Matter

In July 1981 respondent was retained by Mondello's son to represent the father in an action against a roofing contractor who failed to complete a job. Respondent received a $150 retainer, which he deposited in his business account. Thereafter, respondent visited the client's home to discuss the case and look at the roof. Following that visit, Mr. Mondello was unable to contact respondent. Respondent took no further action on this case.

## IV—*R.* 1:21–6 Violation

In addition to the three individual complaints considered above, the ethics complaint by Chelano prompted an audit of respondent's attorney's accounts. Such audits are undertaken when there is reason to believe that a violation of the record-keeping requirements of *R.* 1:21–6 has occurred. Pursuant to *R.* 1:21–6(g), upon request of the Division of Ethics and Professional Services of the Administrative Office of the Courts, an attorney shall produce his bookkeeping records for review and audit by the Division's accountant. Following the review, the accountant determined that respondent was not in compliance with *R.* 1:21–6. He did not maintain separate business and trust accounts and all funds were commingled in a single account. Nor did he maintain ledger cards. The checks and bank statements did not bear respondent's name but that of "The Law Shop," a trade name under which he practiced. As of February 1982 that account had a balance of $3.56, with both the Aguilar and Mondello retainers no longer on account.

The District IV Ethics Committee concluded that in the Chelano, Aguilar and Mondello cases, respondent improperly and continually commingled funds and failed to maintain proper records or render proper accounts to clients. Additionally, with regard to Aguilar and Mondello, it found that respondent had improperly used the retainers and had failed to perform the agreed upon services for these two clients. Finally, it concluded that respondent engaged in illegal conduct, conduct prejudicial to the administration of justice, and conduct involving dishonesty, fraud, deceit or misrepresentation.

On review, the Board, while agreeing that the respondent had been guilty of unethical conduct, found that the record supported findings only of (1) commingling and misuse of clients' funds in violation of DR 9–102 (requiring preservation of identity of funds of a client); (2) a violation of *R.* 1:21–6 (requiring separate business and trust accounts); and (3) in Aguilar and Mondello, failure to carry out contracts of employment in viola-

tion of DR 7–101(A)(2). Contrary to the Committee, the Board did not conclude that respondent engaged in illegal conduct, conduct prejudicial to the administration of justice or conduct involving dishonesty, fraud, deceit or misrepresentation. Although the respondent's defense concerning his handling of the Chelano funds was "at first blush, incredible," the Board after listening to and questioning the respondent, was convinced that his story was true. In deference to its firsthand opportunity better to assess respondent's demeanor and attitude, we accept the Board's conclusion in that respect.

We must closely examine the Board's finding that respondent impermissibly commingled and misused clients' funds in violation of DR 9–102. The trust account violations, although technical in nature, do not involve a misappropriation of funds. Although there is a clear instance of misappropriation when an attorney obtains a settlement on behalf of his client and then uses the money for his own purposes, *In re Wilson*, 81 *N.J.* 451, 454–57 (1979); *In re DeMarco*, 60 *N.J.* 380, 383–84 (1972); *In re Malanga*, 45 *N.J.* 580, 583 (1965); *In re Gavel*, 22 *N.J.* 248, 264–65 (1956), respondent never spent any of the settlement funds concededly belonging to Mr. Chelano. He did use the retainers collected in the Aguilar and Mondello matters on other cases in his law practice. However, we have never held that the expenditure of a retainer is a conversion of trust funds.

DR 9–102(A) of the Disciplinary Rules of the Code of Professional Responsibility provides that all funds of clients paid to a lawyer, other than advances for costs and expenses, shall be deposited in the attorney's trust account.[1] The question in the

---

[1] The Proposed Final Draft, Model Rules of Professional Conduct, May 30, 1981, p. 100, would change the counterpart rule in part by deleting reference to advances for costs. This would implicitly require that retainers for costs be segregated. The comment to Proposed Rule 1.15 states:

Paragraph (a) does not exempt advancements for costs and expenses of litigation from the requirement that a client's funds be separately maintained. *Compare* DR 9–102(A)(2). *See generally* Note, "Attorney Misappropriation of Clients' Funds: A Study in Professional Responsibility," 10

Aguilar and Mondello matters is whether the retainer fees collected by respondent constituted funds of the client, funds of the attorney, or both within the meaning of DR 9–102(A). The traditional view in New Jersey was that "in the absence of an express understanding to the contrary, [a retainer fee] is neither made nor received in payment of services contemplated . . . . [I]t is a fee paid to counsel to make sure that he will represent and render service to his client in a given matter or matters." *Conover v. West Jersey Mortgage Co.*, 96 *N.J.Eq.* 441, 451 (Ch. 1924). However, while the term "retainer" once had a definite meaning, today's definition is not so clear. It has been suggested that retainers should be treated as trust funds. Debevoise, "How to Avoid Ethics Complaints," 91 *N.J.Lawyer* 9 (May 1980). In Massachusetts ethical opinions have defined a retainer as "usually a payment on account of future services." Ethical Opinion No. 78–11, 63 *Mass.L.Rev.* 231 (1978). *See also* ABA Comm. on Ethics and Professional Responsibility, Informal Op. 998 (1967) at 165. In such a case the retainer "may or may not be sufficient to cover all of the services necessary in the particular matter. It may also exceed the amount necessary in the matter, in which case the lawyer is obliged to account for the return of the unused portion to the client." 63 *Mass.L.Rev.* at 231.

In some jurisdictions the meaning of "retainer" depends upon the agreement between a lawyer and his client. *Fla.Ops.* at 88 (1977), Opinion No. 76–27 (September 15, 1976); *Texas Op.* 391, 41 *Tex.B.J.* 322, 323 (1978). Under that test, the record is inadequate to determine whether the sums received in the

U.Mich.J.L.Ref. 415 (1977). Paragraph (a) does not apply to unearned prepaid legal fees, but any unearned amounts must be returned to the client at the termination of the lawyer's services under Rule 1.16. *See generally* Note,. "Attorney Misappropriation of Clients' Funds," *supra,* at 436.

On September 22, 1982, we referred the draft rules to a special Committee on Model Rules of Professional Conduct.

Mondello and Aguilar cases were to be treated as trust funds.[2] Surely a lawyer would be guilty of unethical conduct in those cases in which the dishonest conduct of the attorney consists of receiving advance fees under circumstances such that the attorney knows or should know that the services for which fees were advanced will not be performed by him. DR 1–102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit or misrepresentation); DR 6–101 (failing to act competently); DR 7–101(A)(2) (knowing failure to carry out a contract of employment). *See also In re Palmieri,* 75 *N.J.* 488, 489 (1978) (unprofessional to accept retainer but not to have office procedure adequate, among other things, to inform clients of status of cases). *Cf. R.* 1:28–3(a) (Clients' Security Fund allows reimbursement for dishonest conduct).

However, the shortages in the respondent's accounts are attributable to the view that it was a misuse of clients' funds to spend these retainers prior to performing the services agreed upon. There was no finding of fraud or deceit. In New Jersey it has not been held that a general retainer fee must be deposited in a trust account. DR 9–102(A) does not clearly call for its deposit. We adhere to that view pending our review and action upon the report and recommendations of the Supreme Court Committee on Model Rules of Professional Conduct, and hold that absent an explicit understanding that the retainer fee be separately maintained, a general retainer fee need not be deposited in an attorney's trust account. *See Matter of Zderic,*

---

[2]From the record it appears that the $200 retainer in Aguilar and the $150 retainer in Mondello may have been advances for costs. If indeed these advances were for costs, they would not have to be deposited in a trust account. DR 9–102(A). However, respondent never made it clear whether the retainers were advances for costs or not. In cases involving funds in the hands of an attorney that belong to the client, "the strictest rules of conduct apply ... and every presumption works against the wrongful user." *In re Gavel,* 22 *N.J.* 248, 264 (1956). For present purposes, we view the funds as retainers, not advances for costs.

92 *Wash*.2d 777, 600 *P*.2d 1297, 1302 (1979) (failure to deposit retainer in trust account not reached).

Nevertheless, we find that respondent was guilty of ethical breaches. Respondent maintained only one account, a violation of DR 9–102(C), and failed to segregate Chelano's funds in a trust account. By the same token his records as annexed to the affidavit of the official auditor clearly disclosed what he did. There was nothing covert. He used retainer fees from both Aguilar and Mondello without performing the services. Both Aguilar and Mondello would have been entitled to a return of funds for the services not performed. DR 2–110(A)(3). Respondent's conduct in thus using these fees evidences a knowing violation of his agreement to carry out his contract of employment and is unethical. DR 7–101(A)(2).

Taken in their entirety, these transactions commenced in September of 1981 and were concluded in March of 1982. They represent an initial span of practice for this respondent. Although respondent was admitted to practice in 1972, he never used his license either in private practice or otherwise until 1981. Prior to that time, he was employed by the Internal Revenue Service for five years as an estate tax agent, where he audited estate and gift tax returns and from 1977 through 1981, he pursued a career outside of the law. In June of 1981, he began working as an attorney in New Jersey for a Florida firm that had opened up a form of retail law office under the trade name "The Law Shop" in a Jefferson Ward store in Cherry Hill, New Jersey. Respondent's bank accounts and correspondence were under the heading of "The Law Shop." He was inadequately prepared for what was essentially a new career. He was given no guidance by those who ran The Law Shop and his current encounter with the ethics system was nearly unavoidable.

We are satisfied that respondent's action with regard to his duties as an attorney evidenced a total lack of knowledge or comprehension with regard to proper handling of clients' funds, and these violations are extremely serious. However, we must

assay the penalty in view of our conclusion that it would be unfair to treat the two retainer funds as trust funds under the circumstances of this case. The violations clearly and convincingly shown are that respondent knowingly failed to carry out his contracts of employment in the Aguilar and Mondello matters in violation of DR 7–101(A)(2), failed to maintain the identity of Chelano's funds in violation of DR 9–102(A), failed to pay them over promptly in violation of DR 9–102(B)(4), and failed to comply with the recordkeeping provisions of *R.* 1:21–6 in violation of DR 9–102(C). We believe the respondent's conduct in this matter falls somewhere between the actions taken by the respondents in *In re Getchius,* 88 *N.J.* 269 (1982) (failure to act competently in six matters showing a pattern of neglect and deceit; two year suspension), and *In re Barry,* 90 *N.J.* 286 (1982) (responsibilities beyond capacity of youthful attorney without supervision; three month suspension). Since we accept and agree with the Board's conclusion that the respondent did not act illegally or in a manner involving dishonesty, fraud, deceit or misrepresentation, we conclude the appropriate discipline is to suspend respondent for one year.

Respondent is hereby suspended from the practice of law for a period of one year.[3] His readmission shall be conditioned upon successful completion of a Skills and Methods training course or a similar course concerning legal ethics, legal accounting and New Jersey Practice, and shall be limited to practice with a law firm where respondent will receive adequate supervision and training for a period of two years thereafter. We further direct that respondent reimburse the Administrative Office of the Courts for costs.

So ordered.

---

[3]During the period of suspension, *R.* 1:21–8 prohibits respondent from practicing law as a clerk in a law office. *See also* DRB Reg. No. 13(1) as approved by this Court on April 11, 1978. Respondent's request to do so must, therefore, be denied.

622

*For suspension* —Chief Justice WILENTZ and Justices CLIF-FORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI —7.

*Opposed* —None.

## ORDER

It is ORDERED that ROBERT S. STERN of CHERRY HILL be suspended for one year and until further order of the Court, effective May 16, 1983; and it is further

ORDERED that ROBERT S. STERN reimburse the Administrative Office of the Courts for administrative costs; and it is further

ORDERED that favorable action on respondent's application for restoration to the practice of law shall, in addition to all other requirements, be conditioned upon his successful completion of a Skills and Methods training course or a similar course concerning legal ethics, legal accounting and New Jersey practice and such restoration shall be limited to practice with a law firm where respondent will receive adequate supervision and training for a period of two years thereafter; and it is further

ORDERED that respondent is restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that respondent comply with the regulations of the Disciplinary Review Board governing suspended, disbarred or resigned attorneys.