583 A.2d 1140

IN THE MATTER OF KENNETH P. ZAUBER, AN
ATTORNEY-AT-LAW.

Argued November 26, 1990—Decided January 18, 1991.

*Richard J. Engelhardt,* Assistant Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Richard F. Aronsohn* argued the cause for respondent (*Aronsohn & Weiner,* attorneys; *Ronald S. Bergami,* on the brief).

PER CURIAM.

Following a jury trial, respondent, Kenneth P. Zauber, was convicted in the United States District Court for the District of New Jersey of Racketeer Influenced and Corrupt Organization Act (RICO) conspiracy, in violation of 18 *U.S.C.A.* § 1962(d), and of soliciting kickbacks in connection with an employee benefit plan, in violation of 18 *U.S.C.A.* § 1954. He also pled guilty in the Superior Court to obtaining controlled dangerous substances by fraud or misrepresentation, in violation of *N.J. S.A.* 24:21–22a(3), and to forgery, in violation of *N.J.S.A.* 2C:21–1a(2).

On motion of the Office of Attorney Ethics (OAE), the Disciplinary Review Board (DRB) unanimously recommended that respondent be disbarred. Respondent did not appeal his criminal convictions and asserts that he does not seek to impugn them in this proceeding. Instead, he argues that he should receive a less severe penalty or that the matter should be remanded to a District Ethics Committee to develop mitigating evidence about his drug dependency. We adopt the recommendation of the DRB.

I

Early in his career, respondent, who was admitted to the practice of law in 1965, distinguished himself as an Assistant

United States Attorney, counsel to the State Commission of Investigation, chief of the trial section in the Criminal Justice Division of the Department of Law and Public Safety, and municipal court judge for Hamilton Township. Even before the convictions that bring him before us, however, respondent ran afoul of the disciplinary system. In 1979, when he was a deputy attorney general, respondent was privately reprimanded for impropriety in soliciting an endorsement to support his quest for a judicial appointment. The person so solicited was the defendant in a civil action instituted by the Attorney General, an action in which respondent had assisted in drafting the complaint.

The DRB summarized the relevant facts about respondent's criminal convictions:

### I–STATE CONVICTION

On September 18, 1984, respondent attempted to fill prescriptions for Schedule II controlled dangerous substances (tylox and ritalin) at two separate pharmacies, by using forged prescription blanks. Both pharmacists refused to fill the prescriptions.

Subsequent investigation revealed that respondent had fraudulently obtained, on approximately 100 occasions, certain pain killers, percodan and tylox, both of which are controlled dangerous substances, by means of forged prescription blanks. Respondent was then charged, via a two-count accusation, with obtaining controlled dangerous substances by fraud and misrepresentation, in violation of *N.J.S.A.* 24:21–22a(3). He was also charged with forgery, in violation of *N.J.S.A.* 2C:21–1a(2). He entered a guilty plea to both counts of the accusation on September 4, 1985. He was later sentenced, on December 13, 1985, to probation for two years and was ordered to perform 150 hours of community service.

On January 8, 1986, pursuant to *R.* 1:20–6(a) and because of this conviction, respondent was temporarily suspended from the practice of law. That suspension remains in effect.

### II–FEDERAL CONVICTION

In 1979, while in private practice, respondent became general counsel to the employee pension benefit plan of Local 701 of the International Brotherhood of Teamsters ("pension fund"), replacing his childhood friend, David Friedland. [Footnote omitted.]

Thereafter, in late 1986, respondent was convicted of mail fraud, in violation of 18 *U.S.C.A.* § 1341; RICO (Racketeer Influenced and Corrupt Organizations Act) conspiracy, in violation of 18 *U.S.C.A.* § 1962(d); and soliciting kickbacks

in connection with an employee pension benefit plan, in violation of 18 *U.S.C.A.* § 1954. Respondent was sentenced, on April 24, 1987, to four years' imprisonment and fined $25,000. By decision issued on August 31, 1988, the United States Court of Appeals for the Third Circuit affirmed respondent's conviction of RICO conspiracy and solicitation of kickbacks. *United States v. Zauber,* 857 *F.*2d 137 (3d Cir.1988). At the same time, the court reversed his conviction of mail fraud and remanded his case for resentencing. Respondent's petition for certiorari was denied by the United States Supreme Court on March 6, 1989. 57 *U.S.L.W.* 3588. [489 *U.S.* 1066, 109 *S.Ct.* 1340, 103 *L.Ed.*2d 810 (1989)].

On May 12, 1989, respondent was resentenced to the same term and fine previously imposed, *i.e.,* four years' imprisonment and a fine of $25,000. At the time of the Board hearings, respondent was incarcerated.

Respondent's criminal conduct and that of his co-conspirators were set forth fully in the opinion of the Third Circuit, as follows:

In the spring of 1982, Friedland and Joseph Higgins (footnote omitted) agreed to try to obtain money from the pension fund to invest in Higgins's Omni Funding Group ("Omni") a Florida-based mortgage company (footnote omitted). Because of his earlier conviction, Friedland was to be a hidden partner in Omni. Friedland told Higgins that he would discuss the matter with Coar and Scotto [trustees of the pension fund], who trusted him. Friedland later reported back to Higgins they would have to pay kickbacks to Coar and Scotto to obtain the money.

Higgins mailed an investment proposal to the pension fund in June, 1982. His letter was the basis for a mail fraud count against Friedland, Coar and Scotto. After a formal presentation, Higgins and the trustees entered into negotiations. Zauber conducted a superficial "due diligence" investigation into Higgins and Omni, and reported favorably on them. At some point pension fund manager Alfred Piperata became suspicious of Higgins and conducted his own investigation. His inquiry revealed Higgins' prior bankruptcy, IRS and repossession problems, as well as his longtime friendship with David Friedland. When Piperata expressed concern to the appellants, he was told not to worry about it.

Higgins testified that sometime after the presentation, he, Friedland, Coar and Scotto had a meeting at a New York restaurant called "Paul and Jimmy's." The purpose of this meeting was to give Coar and Scotto an opportunity to "look over" Higgins and discuss the Omni investment in general.

In October, 1982, Higgins and the pension fund entered into a formal contract. The pension fund agreed to transfer $20,000,000, presently invested with the Magten Asset Management Corporation ("Magten"), to Omni for a thirty-year period. On this investment the pension fund was to set a return 1% higher than the six-month treasury bill rate on residential mortgages and 2% over the treasury rate on commercial mortgages. Omni was to retain any profit above those rates. Commercial loans using pension funds could not exceed 10% of the corpus. Residential loans were to require 100% insurance, and commercial loans 15% insurance. The contract also contained express provisions barring individuals with prior convictions, like David Friedland,

from any involvement in Omni. Zauber's fiance, an associate at a Wall Street law firm, "independently" reviewed the contract.

The $20,000,000 was transferred to Omni in two separate transactions, $15,000,000 by wire and $5,000,000 by mail. These transactions formed the basis for mail and wire fraud counts against Friedland, Coar and Scotto.

In late November, 1982, Omni was having trouble obtaining insurance on the loans. Higgins proposed changing the investment contract to allow for a 15% holdback on each loan in lieu of insurance or a letter of credit.

By letter of December 6, 1982, Zauber approved Higgins's proposed interpretation of the contract. This letter was the basis of a mail fraud count against Zauber and Friedland.

Higgins testified that he, Coar, Scotto and Friedland had a second lunch meeting at "Paul and Jimmy's" sometime in late 1982. At that meeting, Friedland requested that all communications between Omni and Coar and Scotto be made through him, rather than Higgins. Friedland also discussed kickbacks and told Coar and Scotto that their share would come from his half of Omni's profits.

At trial, Higgins testified that Zauber approached him for money on at least six separate occasions beginning in late 1982.[5]

Higgins repeatedly directed Zauber to Friedland and gave Friedland money to pay off Zauber, Coar and Scotto.[6]

In January of 1983, four new trustees joined Coar and Scotto on the board of the pension fund (footnote omitted). The new trustees were told that the "old" trustees would be solely responsible for any liability on prior investments and would continue to monitor them. In late 1983, however, the new trustees learned this was incorrect and became aware of their own responsibility, as fiduciaries, for continuing investments made by the fund. They also learned that the Magten investment was paying 17% while Omni was paying approximately 9% overall. The new trustees began their own investigation into Omni. After a trip to Florida to learn more about Omni, they discovered that Omni had been violating the investment contract by making loans in

---

[5]Higgins testified that Zauber approached him for money "for expenses" in late 1982 and January 1983, at Zauber's wedding on Valentine's Day, 1983, at a Zauber family gathering in 1983, at a jewelry store in Florida on June 8, 1983 and at the Sheraton Hotel at Newark Airport in April 1984. Jt.App. at 1464–1511. Each time, Higgins told Zauber to contact Friedland for the money.

[6]At trial the government introduced evidence that Zauber and his wife were in the process of building a home between August 1983 and late 1984/early 1985 and that they made several large cash payments directly to the architect and general contractor, totalling $115,000. Zauber introduced evidence that his architect advised him to pay in cash to get a better price on the construction and that the money came from bank loans and the sale of other properties.

excess of the 10% corpus limit. Higgins, Friedland and Zauber attempted to cover up these loans by backdating a letter from Zauber authorizing loans in excess of that 10% limit. The new trustees also discovered that many of Omni's loans were in default, and that Omni was making interest payments to the pension fund from the 15% holdback accounts in violation of the investment contract. After the Department of Labor initiated an investigation, Coar and Scotto resigned from that board, Zauber was fired, and the new trustees terminated the pension fund's investment with Omni.

At his resentencing hearing on May 12, 1989, before the Honorable John F. Gerry, respondent argued that his drug addiction had impaired his judgment, but stated "... I do not,. I repeat I do not, abdicate my responsibility for a knowing participation. However marginal, however much of an aberration it may have been, I was indeed a knowing participant...."

[Transcript reference omitted.]

Before us, as before the DRB, respondent urges a remand to a district ethics committee to provide him with the opportunity to demonstrate a relationship between his addiction to drugs and his participation in the pension-fraud scheme. He points out that during the conspiracy, from 1982 to 1985, he was addicted to Percodan, cocaine, and heroin. Respondent seeks to show that the source of his addiction was a painful kidney condition from which he has suffered since childhood. His addiction, he contends, is a mitigating circumstance that should prevent disbarment. Finally, respondent offers to produce the testimony of a social scientist to prove that there is no appreciable difference between an addiction to legal or illegal drugs.

The OAE argues, however, that respondent's drug addiction is not a mitigating factor, and that even if it were, his conduct was so egregious that disbarment is the only appropriate discipline. We agree with that contention.

As the DRB concluded, "the existence of the criminal conviction is conclusive proof of respondent's guilt. *R.* 1:20-6(b)(1); *In re Rosen*, 88 *N.J.* 1, 3 [438 *A.*2d 316] (1981)." The sole issue that remains is the "extent of final discipline to be imposed." *R.* 1:20-6(b)(2)(i); *In re Infinito*, 94 *N.J.* 50, 56, 462 *A.*2d 160 (1983). We may consider in mitigation relevant evidence "that is not inconsistent with the essential elements of the criminal

matter for which the attorney was convicted." *R.* 1:20–6(b)(2)(i).

Here, respondent stands convicted of knowingly participating in a scheme to generate illegal profits for himself at the expense of workers who contributed to the pension fund. His conviction, confirmed by his admission at resentencing, establishes conclusively that respondent acted knowingly and willfully. Although respondent claims that he does not seek to attack his criminal convictions, the inevitable effect of the remand would be to show that his criminal acts were the result of the addiction and therefore he is somehow less culpable. Thus, contrary to his assertion, respondent seeks indirectly to impugn the convictions for criminal conspiracy and soliciting kickbacks.

The DRB correctly assessed the conclusive effect of a conviction for criminal conspiracy:

> Cases involving criminal conspiracy to defraud have uniformly resulted in disbarment. *In re Perwin,* 60 *N.J.* 174 [287 *A.*2d 3] (1972); *In re Yormark,* 60 *N.J.* 175 [287 *A.*2d 4] (1972); *In re Zwillman,* 61 *N.J.* 181 [293 *A.*2d 657] (1972); *In re McGinnis,* 61 *N.J.* 459 [295 *A.*2d 201] (1972). Indeed, in a matter involving one of respondent's co-conspirators, disbarment resulted from conviction for an earlier pension fund fraud scheme. *In re David Friedland,* 95 *N.J.* 170 [470 *A.*2d 3] (1984). Friedland's father was also disbarred for his involvement in that scheme. *In re Jacob Friedland,* 95 *N.J.* 167 [470 *A.*2d 1] (1984).
>
> Similarly, in *In re Huber,* 101 *N.J.* 1 [499 *A.*2d 220] (1985), the attorney was disbarred following his federal conviction for, *inter alia,* criminal conspiracy, mail fraud, and racketeering, resulting from the defrauding of various hospitals by a hospital supply house controlled by the attorney and the attorney's father. *See also In re Surgent,* 104 *N.J.* 566 [518 *A.*2d 215] (1986); *In re Alosio,* 99 *N.J.* 84 [491 *A.*2d 628] (1985).

█ The appropriate punishment for the commission of a crime of dishonesty is disbarment. Such crimes "impugn[ ] the integrity of the legal system" and destroy "public trust and confidence" in the law and legal system. *In re Alosio, supra,* 99 *N.J.* at 90, 491 *A.*2d 628; *see In re Surgent, supra,* 104 *N.J.* at 570, 518 *A.*2d 215. Especially when part of a "sophisticated and continuing" scheme, *In re Alosio, supra,* 99 *N.J.* at 89, 491 *A.*2d 628, such conduct reflects a "lack of moral fiber" inconsistent with the practice of law, *ibid.,* and a "total disregard for

the basic principles of being an attorney," *In re Surgent, supra,* 104 *N.J.* at 570, 518 *A.*2d 215. Respondent's actions fall into this category. He abused his position as general counsel of the employee pension benefit plan to enrich himself while jeopardizing the pension benefits of honest employees. His misconduct involved the practice of law. Moreover, it was not an isolated incident, but a continuing and sophisticated scheme.

Against that stark background, we consider respondent's request for a lesser penalty than disbarment. Although mitigating factors are relevant to the severity of discipline, *In re Infinito, supra,* 94 *N.J.* at 57, 462 *A.*2d 160, drug addiction is generally not such a factor. *In re Peia,* 111 *N.J.* 318, 323, 544 *A.*2d 838 (1988); *In re Stein,* 97 *N.J.* 550, 566, 483 *A.*2d 109 (1984). Moreover, drug addiction, whether to legal or illegal drugs, may not mitigate serious ethical infractions such as misappropriation or crimes involving dishonesty, fraud, deceit, or misrepresentation. *In re Barbour,* 109 *N.J.* 143, 162, 536 *A.*2d 214 (1988). In this matter, we are guided by the principles stated in *In re Hein,* 104 *N.J.* 297, 304–05, 516 *A.*2d 1105 (1986):

> The circumstance of the rehabilitated alcoholic or addict is deeply troubling to us. He has presumably recovered from the condition that contributed to * * * [his unethical conduct], and he will probably never again do any harm. But many of the lawyers, nonalcoholic, nonaddicted, disbarred by us * * * would probably never again [commit unethical acts]. * * * Yet we disbar. That individual harshness * * * is justified only if we are right about the devastating effect misappropriation—unless so treated—has on the public's confidence in the Bar and in this Court. Our primary concern must remain protection of the public interest and maintenance of the confidence of the public and the integrity of the Bar.

The concern that led us to disbar in *Hein* applies with equal force here. *Hein* involved an alcoholic attorney who had misappropriated clients' funds. By comparison, respondent committed crimes of dishonesty while addicted to prescription drugs, cocaine, and heroin. His conduct undermines "the confidence of the public and the integrity of the Bar" as much as that of the respondent in *Hein.* 104 *N.J.* at 304, 516 *A.*2d 1105. Under the circumstances, we agree with the DRB that a remand is

unnecessary and that disbarment is the only appropriate sanction.

Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs, including the costs of transcripts.

*For disbarment*—Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—5.

*Opposed*—None.

## ORDER

It is ORDERED that KENNETH P. ZAUBER of NEW BRUNSWICK, who was admitted to the bar of this State in 1965, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that KENNETH P. ZAUBER be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with disbarred attorneys; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for appropriate administrative costs.