765 A.2d 724

IN THE MATTER OF SAMUEL CONVERY,
JR., AN ATTORNEY AT LAW.

Argued September 26, 2000—Decided February 2, 2001.

*Richard J. Engelhardt*, Deputy Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*John D. Arseneault*, argued the cause for respondent (*Arseneault & Fassett*, attorneys).

PER CURIAM.

This disciplinary proceeding arises from a Motion for Final Discipline Based Upon a Criminal Conviction filed by the Office of Attorney Ethics ("OAE") before the Disciplinary Review Board ("DRB"). The OAE moved for final discipline against respondent Samuel V. Convery, Jr. pursuant to *Rule* 1:20–13(c)(2). The OAE based its motion on respondent's conviction for promising employment or other benefit as consideration for any "political activity" in violation of 18 *U.S.C.A.* § 600 (the Hatch Act). The conviction constitutes a violation of RPC 8.4(b), which states that it is professional misconduct for a lawyer to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer." Five out of seven participating members of the DRB recommended that respondent be reprimanded on the basis of his guilty plea to the federal misdemeanor of promising employment or other benefit for political activity. Two members dissented and voted to withhold decision and to require the OAE

and respondent to submit supplemental briefs on the scope of respondent's unethical conduct and the appropriate discipline.

Under the circumstances of this case, we conclude that a six-month suspension is the appropriate sanction.

I

The limited record reveals the following facts. In 1969, respondent was admitted to the New Jersey bar. He has no prior disciplinary history. At the time that the ethics complaint was filed, respondent practiced with the law firm of Convery & Convery, P.C., together with his two sons. A Democrat, respondent had previously served as the Mayor of the Township of Edison from 1991 to 1993, and prior to his term as Mayor he had been counsel to the Board of Adjustment. In his capacity as Mayor, respondent was well acquainted with Robert F. Engel (Robert F.), a Republican member of the Edison Town Council. During respondent's term as Mayor, a Freeholder had requested that respondent support the effort of Robert J. Engel (Robert J.), the son of Robert F., in obtaining employment with Middlesex County. Respondent agreed to do so. The County's public-property division thereafter hired Robert J. as an at-will employee.

In July 1995, Shobna Patel retained respondent's law firm to represent Pooja M., Inc. ("Pooja") in connection with its purchase and development of real estate in Edison Township. Pooja needed to obtain zoning variances to develop what had been church property. Pooja intended to develop the property as a banquet hall, with a restaurant, a bar, offices, an art gallery and a retail store. The proposed uses required Pooja to obtain use and bulk zoning variances and approval of preliminary site plans from the Township of Edison Board of Adjustment. Respondent's firm was to receive a $100,000 legal fee for the representation, regardless of the success or failure of the project. Respondent's Pre-Sentence Investigation Report reveals that, because of Pooja's financial difficulties, Pooja was unable to pay respondent's entire fee until the project was approved and completed.

In February 1996, respondent filed an application with the Edison Board of Adjustment for variances and site plan approval on behalf of Pooja. There was considerable public opposition to Pooja's project at the first public hearing on April 16, 1996. In his guilty plea to the federal misdemeanor charge, respondent admitted that in August 1996 he promised Robert F. and his son, Robert J., that he would assist the son in obtaining permanent employment with Middlesex County in exchange for the Engels' assistance in obtaining favorable votes for the Pooja project from two zoning board members. At that time, Robert J. worked for Middlesex county as an at-will employee. Respondent acknowledged that, for purposes of the federal charges, his actions in obtaining the Engels' assistance and the members' votes on the project constituted a form of political activity. However, respondent explained that he considered his actions to be permissible lobbying.

Respondent also admitted that after the April 1996 zoning board hearing, he became aware that Gerard Kenny, a member of the Edison Board of Adjustment, had been quoted in a local newspaper article commenting critically about the Pooja project and expressing an intention to vote against it. Kenny then worked as an ironworker out of Ironworkers' Local Union 373 in Perth Amboy. At the time, John Wade was the business agent of Ironworkers' Local Union 373, and usually determined which union members to send out on union jobs. Respondent admitted that he sent a facsimile of the newspaper article, quoting Kenny about the Pooja project, to John Wade, and that he spoke with Wade by telephone about the article. Respondent's Pre-Sentence Investigation Report indicates that after speaking with respondent, Wade visited Kenny at a union job site and showed him a photocopy of the newspaper article. He told Kenny that he should reconsider his opposition to the project because he "was biting the hand that feeds him." However, none of the facts relating to Wade's visit to Kenny formed the basis of defendant's federal plea and, in his objections to the pre-sentence report,

respondent denied having asked Wade to make any such comments to Kenny.

Moreover, respondent's Pre-Sentence Investigation Report reveals that, during the summer of 1996, Robert F. told Kenny that respondent would assist Kenny in obtaining a job with the County of Middlesex or the State of New Jersey if Kenny agreed to vote for the Pooja project. The Board of Adjustment's final vote on the Pooja project was scheduled for August 20, 1996, while Robert F. was at the Republican National Convention. As a result, Robert F. asked his son, Robert J., to meet with Kenny to confirm that he would vote for the Pooja project. During late August, while his father was at the Republican convention, Robert J. spoke to respondent and then met with Kenny to confirm that Kenny would vote for the Pooja project. On August 20, 1996 Kenny voted to approve the Pooja project.

In April 1998, respondent pled guilty to the federal misdemeanor of promising employment or other benefit for political activity in violation of 18 *U.S.C.A.* § 600. Respondent was sentenced to three years probation. As conditions of probation, he was confined to his home for three months, required to perform five hundred hours of community service and fined $5,000. Subsequently, the OAE filed its Motion For Final Discipline against respondent before the Disciplinary Review Board seeking to suspend respondent for six months based solely on his general-intent misdemeanor conviction under 18 *U.S.C.A.* § 600. The DRB determined to grant the OAE's motion for final discipline, but a majority concluded that respondent's misdemeanor conviction warranted only a reprimand. The DRB acknowledged that in most federal misdemeanor cases the Court has imposed terms of suspension ranging from three to six months. However, the DRB relied on *In re Rushfield,* 142 *N.J.* 617, 667 *A.*2d 684 (1995), for the proposition that where compelling mitigating circumstances exist, a reprimand is sufficient punishment for an attorney who pleads guilty to a federal misdemeanor.

The majority of the DRB found that compelling mitigating circumstances were present in this case. The DRB noted that during his career respondent has been actively involved in professional, civic and charitable organizations. In addition, his family, friends and clients have attested to his good character and the fact that, except for this incident, he has led an exemplary life. The majority of the DRB also considered the fact that respondent has agreed to perform community service in excess of what the federal court had required and that he has shown genuine remorse for his misconduct. Accordingly, a majority of the DRB was convinced that a reprimand sufficiently addressed both the disciplinary system's goals of protecting the public and the nature of respondent's offense. Two members dissented, stressing that respondent's misconduct, although a misdemeanor under federal law, would support a conviction of bribery under New Jersey law, a second–degree offense.

## II

A criminal conviction of an attorney is conclusive evidence of guilt in a disciplinary proceeding. *R.* 1:20–13(c)(1); *In re Howard*, 143 *N.J.* 526, 529, 673 *A.*2d 800 (1996); *In re Kinnear*, 105 *N.J.* 391, 393, 522 *A.*2d 414 (1987). Respondent's guilty plea to the federal misdemeanor of promising employment or other benefit for political activity constituted a violation of RPC 8.4(b) because it relates to the commission of a criminal act that reflects adversely on his honesty, trustworthiness or fitness as a lawyer.

Once an attorney is convicted of a crime, the sole issue to be considered is the extent of discipline to be imposed. *R.* 1:20–13(c)(2); *In re Zauber*, 122 *N.J.* 87, 92, 583 *A.*2d 1140 (1991); *Kinnear, supra,* 105 *N.J.* at 393, 522 *A.*2d 414; *In re Goldberg,* 105 *N.J.* 278, 280, 520 *A.*2d 1147 (1987). In assessing the measure of discipline to be imposed, the background facts and circumstances of the case drawn from pre-sentence reports, plea agreements, and other reliable documentation, are relevant. *In re Spina,* 121 *N.J.* 378, 389–90, 580 *A.*2d 262 (1990). Even a minor

violation of the law by an attorney tends to lessen public confidence in the legal profession as a whole. *In re Hasbrouck,* 152 *N.J.* 366, 371, 705 *A.*2d 350 (1998) (citing *In re Addonizio,* 95 *N.J.* 121, 124, 469 *A.*2d 492 (1984)). The commission of a criminal act by an attorney also constitutes a violation of that attorney's duty to uphold and honor the law. *In re Bricker,* 90 *N.J.* 6, 11, 446 *A.*2d 1195 (1982). Pursuant to RPC 8.4(b), for an attorney to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects" constitutes professional misconduct.

■ Determining the appropriate discipline for criminal misconduct by an attorney requires a consideration of many factors, including "the nature and severity of the crime, whether the crime is related to the practice of law, and any mitigating factors such as respondent's reputation, his [or her] prior trustworthy conduct, and general good conduct." *In re Lunetta,* 118 *N.J.* 443, 445–46, 572 *A.*2d 586 (1989). That respondent's crime directly involved the practice of law is undisputed. He improperly attempted to influence a zoning board's decision in favor of his client, Pooja, by promising Robert F. and his son, Robert J., that he would assist the son in obtaining permanent employment with Middlesex County in exchange for the Engels' assistance in obtaining favorable votes from two zoning board members on the Pooja project. Respondent pled guilty to the Hatch Act offense of promising a benefit in exchange for political activity. Specifically, respondent admitted that he offered Robert J. a permanent job with Middlesex County if Robert J. and his father, Robert F., would use their political influence to obtain the favorable votes of two zoning board members for respondent's client's project. The Hatch Act states in part as follows:

[w]hoever, directly or indirectly, promises any employment, position, compensation, contract, appointment, or other benefit, provided for or made possible in whole or in part by any Act of Congress, or any special consideration in obtaining any such benefit, to any person as consideration, favor, or reward for any political activity or for the support of or opposition to any candidate or any political party in connection with any general or special election to any political office, or in connection with any primary election or political convention or caucus held to select

candidates for any political office, shall be fined under this title or imprisoned not more than one year, or both.

[18 *U.S.C.A.* § 600.]

Respondent, as an experienced attorney and ex-counsel to the Edison Board of Adjustment, should have known that influencing two members of a zoning board, a quasi-judicial tribunal, through third parties (the Engels) to vote to grant a variance for the benefit of respondent's client was highly improper.

Zoning boards receive their power directly from the Legislature by virtue of statutory grants of authority contained in the Municipal Land Use Law. *N.J.S.A.* 40:55D–70. New Jersey courts have recognized that Boards of Adjustment are discretionary governmental administrative agencies that exercise quasi-judicial functions. *165 Augusta Street, Inc. v. Collins,* 9 *N.J.* 259, 266, 87 *A.*2d 889 (1952); *Schmidt v. Board of Adjustment of Newark,* 9 *N.J.* 405, 420, 88 *A.*2d 607 (1952); *see also Siegel v. Board of Adjustment of Newark,* 137 *N.J.L.* 423, 425, 60 *A.*2d 626 (1948) (stating that Board of Adjustment is quasi–judicial body whose action must not be arbitrary and uncontrolled). A Board of Adjustment's decision is presumptively valid, and is reversible only if arbitrary, capricious, and unreasonable. *New Brunswick Cellular Telephone Co. v. Borough of South Plainfield Bd. of Adjustment,* 160 *N.J.* 1, 13, 733 *A.*2d 442 (1999) (citations omitted). Most importantly, New Jersey courts have also emphasized that in granting a zoning variance a Board of Adjustment may not base its decisions on facts that are not included in the record. *Kramer v. Board of Adjustment of Sea Girt,* 45 *N.J.* 268, 284, 212 *A.*2d 153 (1965); *Russell v. Tenafly Bd. of Adjustment,* 31 *N.J.* 58, 66, 155 *A.*2d 83 (1959) (stating that "[B]oard [of Adjustment] is not entitled to act on facts not part of the record").

Before us respondent's counsel contended that lobbying influential political or public officials in local, county or state government to solicit support for meritorious projects is an accepted practice, and that respondent assumed that his conduct in seeking Engel's assistance with the Board of Adjustment fell

within the parameters of permissible lobbying efforts. We reject that contention. Putting to one side the promise of a benefit to the Engels for their assistance, respondent attempted to influence members of the Edison Board of Adjustment to cast votes in the Pooja variance matter on the basis of their political relationship with the Engels, rather than on the basis of the evidence adduced at the hearing before the Board of Adjustment and the applicable legal principles that govern a Board of Adjustment's exercise of its authority in variance matters. The attempt by respondent to compromise the standards that govern Board of Adjustment action in variance matters, and to inject political influence into the Board's deliberative process, was manifestly improper.

We conclude that respondent must be subject to significant discipline for his conduct.

### III

The principal goal of disciplinary proceedings is to foster and preserve public confidence in the bar, *In re Hasbrouck,* 152 *N.J.* 366, 371, 705 *A.*2d 350 (1998), and to protect the public from attorneys who do not meet the high standards of professional responsibility. *In re Stout,* 75 *N.J.* 321, 325, 382 *A.*2d 630 (1978). In determining the appropriate sanction in attorney disciplinary matters, we consider the seriousness of the ethical infractions, the circumstances surrounding the misconduct, and the respondent's record and reputation. *In re Whitmore,* 117 *N.J.* 472, 479, 569 *A.*2d 252 (1990); *Stout, supra,* 75 *N.J.* at 325, 382 *A.*2d 630.

In *In re Verdiramo,* 96 *N.J.* 183, 186, 475 *A.*2d 45 (1984), the Court made clear the seriousness of the transgressions that directly subvert and corrupt the administration of justice. *In re Verdiramo,* 96 *N.J.* 183, 186, 475 *A.*2d 45 (1984). We therefore stated that "ethical misconduct ... involving the commission of crimes that directly poison the well of justice [ ] is deserving of severe sanctions and would ordinarily require disbarment." *Id.* at 186, 475 *A.*2d 45.

The OAE relies on cases in which the Court has ruled that attorneys who commit crimes in the course of attempting to

benefit a friend, a client or themselves should receive substantial suspensions. *In re Bateman,* 132 *N.J.* 297, 297–98, 625 *A.*2d 467 (1993) (suspending attorney for two years for mail fraud, conspiracy and making false statement on loan application to assist his client); *In re Gassaro,* 124 *N.J.* 395, 395–96, 591 *A.*2d 276 (1991) (suspending attorney for two years following conviction of conspiracy to defraud Internal Revenue Service on behalf of his father-in-law); *In re Chung,* 147 *N.J.* 559, 559–60, 688 *A.*2d 1043 (1997) (suspending attorney for eighteen months following guilty plea to federal information charging him with personally receiving more than $10,000 and failing to report cash transaction); *In re Silverman,* 80 *N.J.* 489, 491, 404 *A.*2d 301 (1979) (suspending attorney for eighteen months following guilty plea to federal indictment charging him with obstruction of justice for having filed false statement in answer in bankruptcy proceeding to favor his client). We also note that in matters involving federal misdemeanor charges, the Court often has imposed terms of suspension. See *In re Leahey,* 118 *N.J.* 578, 573 *A.*2d 155 (1990) (suspending attorney for willful failure to file income tax returns); *In re Di Biasi,* 102 *N.J.* 152, 506 *A.*2d 719 (1986) (suspending attorney for three months for misapplication of bank funds).

We recognize that significant mitigating circumstances exist in this case. During his career respondent has been actively involved in professional, civic and charitable organizations; his family, friends and clients have attested to his good character; he has agreed to perform community service in excess of that required by the federal court; he has shown remorse for his conduct; and except for this incident, he has an unblemished disciplinary record. We are also aware that respondent already has been subjected to substantial punishment for his actions. He was sentenced to three years probation, confined to his home for three months, required to perform five hundred hours of community service and to pay a fine of $5,000.

Our dissenting colleagues assert that the six months suspension the court imposes is too severe, noting that respondent "did

believe that he was engaged in legal lobbying" and that "the DRB and the OAE credited his belief." *Post* 166 *N.J.* at 312, 765 *A.2d* at 731. They would suspend the imposition of a suspension, place respondent on probation for the term of the suspension and require respondent, as a condition of probation, to perform 1000 hours of community service with credit for the community service performed pursuant to the federal court sentence. In response, we note the sharply worded dissenting opinion, joined by two members of the Disciplinary Review Board, that asserts that respondent's conduct, as described in the pre-sentence report submitted to the District Court, would have been sufficient to sustain a conviction under New Jersey's bribery statute, *N.J.S.A.* 2C:27–2(b), a second–degree offense. Although we express no view on that issue based on the state of the record before us, we are fully satisfied that the seriousness of respondent's offense mandated discipline no less severe than that imposed by the Court, and would warrant more stringent discipline were it not for the mitigating circumstances presented.

Respondent's ethical transgressions were serious, and his actions compromised the integrity of the Edison Board of Adjustment's disposition of the variance application of respondent's client. We conclude that respondent's conduct warrants a six–months suspension from the practice of law. Respondent is also ordered to reimburse the Disciplinary Oversight Committee for appropriate administrative costs.

ZAZZALI, J., concurring and dissenting.

The majority fairly sets forth the facts of this case in a comprehensive opinion. I concur with the determination that respondent's conduct violates *R.P.C.* 8.4(b). I also agree that a penalty must be imposed upon respondent. I respectfully dissent, however, with regard to the quantum of that penalty. A reprimand and a probationary sanction including additional community service would satisfy the need to protect the public interest while serving the administration of justice.

The following factors are relevant to the analysis: the decision of the Disciplinary Review Board (DRB or Board) to impose a reprimand; the determination of the Office of Attorney Ethics (OAE) not to appeal the DRB decision; the lack of knowledge on the part of respondent that his conduct was criminal; the context in which this dispute arose; the DRB dissent; the substantial mitigation; and the fairness of prospectivity. I review those circumstances *seriatim.*

## The DRB

Our review is *de novo* on the record. *R.* 1:20–16(c). Nonetheless, it is appropriate in these circumstances to give due deference to the determination of the DRB. The DRB has achieved substantial expertise and experience in attorney disciplinary matters. Just as lower courts enjoy the "feel of the case" in assessing whether a miscarriage of justice occurred, *Carrino v. Novotny*, 78 *N.J.* 355, 361, 396 *A.*2d 561 (1979), the DRB has a similar "feel" in ethics cases. In the past, we have shown deference to the DRB's "firsthand opportunity ... to assess respondent's demeanor and attitude." *In re Stern*, 92 *N.J.* 611, 617, 458 *A.*2d 1279 (1983). The Board is also in the best position to evaluate the totality of the circumstances, including respondent's character, ethics history, culpability, and remorse, as well as any mitigating and aggravating factors. Far from being timid about penalties, the DRB imposes suspensions when appropriate. In this case, it decided not to suspend. I would accord appropriate weight to that decision.

## The OAE

Deference is also appropriate in this case because the OAE declined to appeal the DRB recommendation of a reprimand to the Court. As with the DRB, reticence is not the hallmark of the OAE. The OAE pursues ethics violations with diligence, especially those concerning alleged interference with the governing process. Although the OAE urged that a six-month suspension be imposed

when it was before the DRB and when it appeared before the Court, the OAE chose not to petition for review of the DRB imposition of a reprimand. The OAE's decision not to appeal suggests that the interests of justice are served by a reprimand. However, as discussed below, I would add additional conditions to that penalty.

Although not dispositive, the views of those two respected ethics agencies, the DRB and OAE, are relevant.

### Lack of Knowledge

The DRB found that respondent "did not realize ... that his conduct was criminal." The OAE agreed, stating in its brief that respondent

did not realize that his conduct was criminal in nature. Although it has often been said that ignorance of the law or disciplinary rules does not diminish responsibility for an ethics violation, it does not seem appropriate to hold respondent to the same standard as an attorney who knowingly committed a federal felony.

Again, the OAE stated that respondent "did not knowingly commit a crime." The OAE elaborated at the DRB hearing when it said that respondent "didn't realize he was committing a crime. *He thought he was engaging in political lobbying.*" (Emphasis added.)

Fundamental fairness requires that we make a decision upon the record as presented. This was a violation of the Hatch Act. That is what was charged, nothing more, nothing less. Judge Rodriguez has duly punished respondent for that infraction. We must determine how that should affect his professional standing. Our ethics jurisprudence and common sense allow us to look at respondent's state of mind in determining that penalty. Here, the DRB and the ethics prosecutor concluded that respondent did not know he was committing a crime. If it was clear to respondent that his conduct was criminal, I would join the majority. Indeed, I would argue for an even stronger penalty. But respondent believed that his conduct was political, not criminal. Sadly, that is a fine line that is all too often blurred.

I do not suggest that the absence of criminal intent exonerates respondent. He is not a naif—he knew what he was doing. Nonetheless, he did believe that he was engaged in legal lobbying. That belief may be irrelevant to law enforcement authorities, but it is germane to an ethics determination. Importantly, the DRB and the OAE credited his belief. That does not exculpate; it does mitigate.

### Context

This matter should be measured in the factual crucible in which it occurred. Years ago, and long before the incident in question, respondent, as Mayor of Edison, supported Robert J. Engel's initial appointment to an at-will County job. Again, long prior to this dispute, respondent also assisted Engel's unsuccessful efforts to convert his employment status from at will to permanent. At the meeting in question, the Engels sought respondent's assistance in changing the younger Engel's position to a permanent one. Respondent agreed and, in turn, the Engels agreed to help with the votes.

That background is not determinative and has only marginal value. Yet, as we try to understand what happened and what we should do about it, it is helpful to know that there was a long history of efforts, neither unethical nor unlawful, by respondent to help Engel. Respondent also represents that the Engels initiated the final improper meeting. That representation has gone unchallenged. Neither fact, however, undermines that which is conclusively established by the criminal conviction: respondent's conduct on this occasion was both unlawful and unethical. It is nonetheless important to note that respondent's infraction occurred within the above context.

### The DRB Dissent

A brief comment is appropriate on the dissent of the DRB member who argued that respondent's conduct was bribery. I respect that sincerely-held view. The majority of the Court,

however, takes a better approach by avoiding a discussion of the merits of the bribery issue. And the DRB majority expressed a better view when it stated in its opinion that "it would do 'violence to the procedures that govern our disciplinary function' to analogize respondent's misconduct to a bribery offense." (Citation omitted). There simply is no verdict or plea to support bribery, and it is presumptuous and unfair to "find" it here. The United States Attorney did not charge bribery; a federal jury did not convict him of bribery; and respondent did not plead guilty to bribery. Similarly, the State did not charge respondent with bribery. We cannot come to a conclusion on the issue without a complete record. In *State v. Schenkolewski*, 301 *N.J.Super.* 115, 141, 693 *A.*2d 1173 (App.Div.), *certif. denied*, 151 *N.J.* 77, 697 *A.*2d 549 (1997), a case involving defendants indicted for bribery who claimed that they only intended to engage in lobbying, the court found that "it would be for the jury to decide with what subjective intent these defendants accepted the money." So too, I am uncomfortable finding bribery in general or deciding questions of intent in particular without traditional safeguards that attend a criminal proceeding. We should not surmise whether this is bribery or not, as does the DRB dissent. If the United States Attorney and the State of New Jersey did not indict and convict respondent of bribery, neither should we.

The only fact we know for certain is that he was charged with and pled guilty to a violation of the Hatch Act, a "fairly obscure and moribund statute" with its "somewhat arcane criminal code provisions." Stanley Brand, *The Hatch Act: Little Known Statute May Become Important in Evaluating Political Activity by Presidential Aides*, 44 *Fed. Law.* 12 (Mar./Apr.1997). We should base our finding on the indisputable conviction under the Hatch Act. I am not inclined to work backwards, to rummage through the ethics warehouse to find any arguably applicable crime to fit a desired penalty. We should follow the traditional route and find a fair penalty that fits the established violation.

## *Mitigation*

The DRB found:

> There are ... *compelling* mitigating circumstances in this case. During his career, respondent has been actively involved in professional, civic and charitable organizations. His family, friends and clients have attested to his good character and the fact that he has, except for this incident, led an exemplary life. Although restitution was not applicable in respondent's case, he has agreed to perform community service in excess of that required by the court. Finally, ... respondent has shown genuine remorse for his misconduct ... [and] has enjoyed a previously unblemished thirty-year legal career.
>
> [(Emphasis added.)]

The majority opinion of the Court also recognizes that significant mitigating circumstances inhere in this case. The Office of the United States Attorney acknowledged that respondent "clearly demonstrated a recognition and acceptance of responsibility for his conduct in this matter." Finally, Judge Rodriguez stated at sentencing: "I am certain that this offense may be unique in your life, [and] I don't think we will ever see you again in a court of law under these circumstances." The mitigation is compelling, as the DRB found.

## *Prospectivity*

*R.P.C.* 8.4(b) states that an attorney cannot commit an act that "reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer." If an attorney does so, he or she must be punished. Respondent cannot argue that that proscription is in any sense new. Punishment is appropriate. Yet, one of the difficulties in this matter is that the facts are somewhat unique. Respondent pled guilty to a violation of the Hatch Act. Both the DRB and OAE agreed, at argument before the DRB, that this case is a matter of first impression, at least insofar as the Hatch Act is concerned. The case law does not provide guidance on the discipline for the type of "influence" present in this case. It is unfair if we ratchet up the heat on the ethics thermometer for the first time here.

A primary reason behind punishing ethics infractions is to deter other attorneys from engaging in similar conduct. We satisfy the

interests of deterrence if we announce that hereafter a suspension without conditions will be the general rule for attorneys who engage in such activity. Prospective application is appropriate and fair in the totality of the circumstances of this case. The Bar will be on notice that such activity, however characterized, will be punished in the future. Although a bright-line demarcation has not been present to date, suspension should be the general rule hereafter.

At the time of sentencing, Judge Rodriguez captured the context when he observed that respondent's conduct occurred

in a world where unfortunately, in the scheme of things, much of the activity that has taken place in this situation, is either condoned or determined to be the proper course of conduct in the way of doing business.

Although Judge Rodriguez did not sanction such activity, and in fact condemned it as serious, as do we, he assists our review because he identified the political milieu in which respondent's misconduct occurred. Just as he balanced the wrong against the reality in meting out the sentence, we achieve justice if we issue a probationary sanction together with a reprimand, plus additional community service, and a warning to all that suspension without conditions will be the byword for those who continue to conduct "business as usual."

*Penalty*

Respondent's sentence for the Hatch Act violation was three years probation, confinement to his residence for three months, 500 hours of community service, and a $5,000 fine. The majority opinion correctly notes that respondent has already been subject to substantial punishment for his actions. Although I concur with the opinion of the majority that a suspension is in order, I would then, as the Court may do, "suspend the suspension," issue a reprimand, and impose a probationary sanction with additional stipulated community service, penalties that in the aggregate would satisfy the ethics process.

This Court on occasion has imposed a probationary sanction embracing community service. As Justice Handler noted in *In re Kotok,* 108 *N.J.* 314, 332, 528 *A.*2d 1307 (1987), that type of sanction has been viewed approvingly by the American Bar Association and a number of other jurisdictions as an alternative to the traditional disciplinary measures. In New Jersey, such a sanction ordinarily has been reserved for situations in which the ethical infractions are remote in time and the respondent has since demonstrated an exemplary record as a professional. *In Re Alum,* 162 *N.J.* 313, 744 *A.*2d 172 (2000); *Matter of Stier,* 108 *N.J.* 455, 530 *A.*2d 786 (1987); *Matter of Kotok, supra,* 108 *N.J.* 314, 528 *A.*2d 1307. Although there was a longer hiatus in those cases between the transgression and discipline, mitigating circumstances here justify invoking that remedy.

Importantly, those cases note that one of the goals of discipline—rehabilitation—would not be advanced by imposing a suspension where rehabilitation already has been realized. Similarly, in this case, I believe that respondent already has been rehabilitated in the sense that he now knows that his conduct, though seemingly "political" to him at the time, was criminal. Both respondent and the Bar are now on notice that a similar Hatch Act violation by an attorney will not be tolerated by this Court. The goals and purposes of discipline, however, are not furthered by imposing a suspension on an attorney for a violation that previously had not been confronted by this Court in the context of a disciplinary proceeding. The penalty of a probationary sanction is a sensible solution that should be used in limited circumstances such as those present here.

### Conclusion

The majority makes a principled case for a suspension without conditions. It is a close question. I would give the benefit of the doubt to respondent under the circumstances. I would suspend the suspension as the Court did in *Kotok.* 108 *N.J.* at 332, 528 *A.*2d 1307; *see also In re Alum, supra,* 162 *N.J.* at 316, 744 *A.*2d 172 (suspending one-year suspension); *In re Schaffer,* 140 *N.J.*

148, 161, 657 *A*.2d 871 (1995) (suspending three-month suspension); *In re Ichel,* 126 *N.J.* 217, 218, 595 *A*.2d 515 (1991) (suspending six-month suspension). I then would impose a reprimand together with a probationary sanction embracing 1,000 hours of community service, with appropriate credit for service performed as a result of his federal court sentence. A total of 1,000 hours of community service is the functional equivalent of a six-month suspension. The proposed resolution serves the dual purpose of punishment and deterrence. Such a result does not strain mercy—or justice—beyond reasonable limits.

I therefore dissent with regard to the penalty imposed by the majority.

Justice LONG joins in this opinion.

*For suspension*—Chief Justice PORITZ and Justices STEIN, COLEMAN and VERNIERO—4.

*Concurring in part, dissenting in part*—Justices ZAZZALI and LONG—2.

## ORDER

**SAMUEL V. CONVERY, JR.,** of **METUCHEN,** who was admitted to the bar of this state in 1969, having been Ordered to Show Cause why he should not be disbarred or otherwise disciplined,

And good cause appearing;

It is ORDERED that **SAMUEL V. CONVERY, JR.,** be suspended for six months and until the further Order of the Court, effective February 23, 2001; and it is further

ORDERED that respondent be restrained and enjoined from practicing law during the period of his suspension and that he comply with *Rule* 1:20–20, which governs suspended attorneys; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter, including the costs of transcripts.