IN THE MATTER OF KARL R. HUBER, AN
ATTORNEY AT LAW.

October 21, 1985.

## ORDER

The Disciplinary Review Board having filed a report with the
Supreme Court recommending that KARL R. HUBER, of
NEWARK, who was admitted to the Bar of this State in 1965,
be disbarred, and good cause appearing;

It is ORDERED that the findings of the Disciplinary Review Board are hereby adopted and respondent is disbarred, effective immediately; and it is further

ORDERED that KARL R. HUBER be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that KARL R. HUBER reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with suspended, disbarred or resigned attorneys.

### *Decision and Recommendation of the Disciplinary Review Board*

This matter is before the Board on a Motion for Final Discipline filed by the Office of Attorney Ethics. This is based on Respondent's criminal conviction in the United States District Court for the Southern District of New York of conspiracy, false statements, mail fraud, perjury and racketeering, all in violation of federal law.

Respondent and three others were indicted in a multi-count indictment returned by a federal grand jury in 1978. The charges pertained to Respondent's activities concerning Hospital Equipment Company (HEC), a New Jersey hospital supply house, and its divisions and corporate successors. Respondent and his father obtained control of HEC in October, 1971. HEC had entered into a number of cost-plus contracts with hospitals in New York and New Jersey for the sale of hospital and surgical supplies, furniture and equipment. Respondent was involved in and managed the hospital supply business on a day-to-day basis, and was kept apprised in detail about new contracts as they were being made. The record established that:

> Shortly after the Hubers acquired HEC, and at their specific direction, HEC employees Conroy and Eckert .... began to inflate the manufacturers' costs

quoted to the hospitals. At appellant's [Respondent's] suggestion, invoices were falsified where necessary. The hospitals were also charged for freight not actually incurred. The term "phantom freight," apparently coined by appellant's father, was in general usage at the office. As a result of these fraudulent practices, HEC and Medical Facilities received an effective mark-up of roughly between 18 percent and 29 percent rather than the five to eight percent specified in the contracts. There was evidence that the mails were used in connection with the scheme to defraud the hospitals. The fraudulent over charges totalled nearly $471,000, most of which was subject to reimbursement by either the federal or state government [footnote omitted]. Further, each hospital capitalized the costs incurred in outfitting it, and a depreciation expense was annually claimed as part of each hospital's operating expenses. These expenses were reported to insurance companies, which served as fiscal intermediaries for the Medicare and Medicaid Programs. The cost reports formed the basis for reimbursement by the federal and state governments, and the fraud resulted in an inflated depreciation claims of nearly $105,000. The nature of the federal and state hospital funding programs was made clear to the Hubers from the outset of their involvement in the hospital supply operation, and they understood that those programs would stimulate hospital expansion.

In July 1977, appellant appeared before a grand jury that was investigating whether fraud had been committed by HEC or its successors. Appellant denied to the grand jury that he exercised close control over the hospital business and that he knew of the cost-plus nature of the contracts or the meaning of the term "phantom freight." The proof at trial overwhelmingly showed otherwise. In defense, appellant contended that he and his father had been cheated by Conroy and Eckert and that if appellant was directly involved in the fraudulent scheme, because of the peculiar relationship between him and his domineering father, appellant lacked the independence of will necessary to form the intent needed to sustain the convictions [*United States v. Huber*, 603 *F*.2d 387, 390–391 (2d Cir.1979), *cert.* den. 445 *U.S.* 927, 100 *S.Ct.* 1312, 63 *L.Ed.*2d 759 (1980)].

Following a ten-week trial, a federal jury convicted Respondent of one count of conspiracy, nineteen counts of making false statements, eight counts of mail fraud and one count each of perjury and racketeering. He was sentenced to a total of four years imprisonment, was fined $5,000 on the conspiracy count and on each of the false statement counts, and $1,000 on each of the mail fraud counts, a total of $108,000. For his conviction of racketeering, the court directed conditional forfeiture of Respondent's enterprise which gave Respondent the option to redeem his corporations by paying within six months cash or other property having a value of $100,000. His convic-

tion was later affirmed by the United States Court of Appeals for the Second Circuit and the United States Supreme Court denied *certiorari*. *Ibid.* The trial of Respondent's father had been severed because of ill health. The other codefendants, Conroy and Eckert, had pleaded guilty prior to trial.

Respondent had been temporarily suspended from the practice of law on March 27, 1979, following his federal convictions.

The Office of Attorney Ethics now requests this Board to recommend to the Supreme Court that Respondent be disbarred.

## CONCLUSION AND RECOMMENDATION

A judgment of conviction is conclusive evidence of Respondent's guilt. *R.* 1:20–6(b)(1). Thus, there is no need to make an independent examination of the underlying facts to ascertain guilt. *In re Bricker,* 90 *N.J.* 6, 10 (1982). The only issue to be determined is the extent of final discipline to be imposed. *R.* 1:20–6(b)(2)(ii). Respondent's conviction establishes he had engaged in illegal conduct that had adversely reflected on his fitness to practice law. *DR* 1–102(A)(3) and (6).

Respondent was admitted to the bar in 1965. He was an honors graduate of a prestigious university in this state and of a prominent law school. He was involved in a continuing fraud against the taxpayers of this nation. His actions cannot be tolerated.

It is well settled in this state that an attorney is obligated to adhere to the high standards of conduct required of a member of the bar even though his activities did not involve the practice of law. *In re Suchanoff,* 93 *N.J.* 226, 230–231 (1983); *In re Franklin,* 71 *N.J.* 425, 429 (1976). The Board finds that Respondent's conviction of perjury demonstrates his unfitness to be a member of the bar of this state. Good moral character is a basic condition for membership in the bar. *In re LaDuca,* 62 *N.J.* 133, 140 (1973). His convictions on the other counts reinforce the conclusion that he should be disbarred. *In re*

*Friedland,* 95 *N.J.* 167, and 95 *N.J.* 170 (1984). Accordingly the Board recommends disbarment.

The Board further recommends that Respondent be required to reimburse the Ethics Financial Committee for appropriate administrative costs.