572 A.2d 586

IN THE MATTER OF CARMINE P. LUNETTA, AN
ATTORNEY AT LAW.

Argued June 1, 1989—Decided July 21, 1989.

*Robyn M. Hill,* Chief Counsel, Disciplinary Review Board, argued the cause on behalf of Office of Attorney Ethics.

*Carmine P. Lunetta* argued the cause *pro se.*

PER CURIAM.

This disciplinary proceeding arose from a motion filed by the Office of Attorney Ethics (OAE) before the Disciplinary Review Board (DRB), seeking disbarment of respondent, Carmine P. Lunetta, pursuant to *Rule* 1:20–6(b)(2)(i). The motion was based on respondent's plea of guilty to a criminal Information charging him with knowingly and willfully conspiring to receive, sell and dispose of stolen securities in violation of 18 *U.S.C.* § 317 and 18 *U.S.C.* § 2315. The DRB found that respondent engaged "in illegal conduct that adversely reflects on his fitness to practice law" in violation of *DR* 1–102(A)(3) and (6); that his conduct involved "dishonesty, fraud, deceit or misrepresentation" in violation of *DR* 1–102(A)(4); and recommended that respondent be disbarred. Our independent review of the record leads us to accept that recommendation.

I

It is well-established that in disciplinary proceedings against an attorney, a criminal conviction is conclusive evidence of respondent's guilt. *R.* 1:20–6(b)(1). The sole issue to be determined, therefore, is the extent of the final discipline to be imposed. *R.* 1:20–6(b)(2)(ii). *In re Goldberg,* 105 *N.J.* 278, 280, 520 *A.*2d 1147 (1987); *In re Litwin,* 104 *N.J.* 362, 364–65, 517 *A.*2d 378 (1986); *In re Kushner,* 101 *N.J.* 397, 400, 502 *A.*2d 32 (1986); *In re Alosio,* 99 *N.J.* 84, 88, 491 *A.*2d 628 (1985). In determining the appropriate discipline, "the Court's goal is to protect the interests of the public and the bar while giving due consideration to the interests of the individual involved." *In re Litwin, supra,* 104 *N.J.* 365, 517 *A.*2d 378. In meeting this goal, we consider the nature and severity of the crime, whether the crime is related to the practice of law, and any mitigating

factors such as respondent's reputation, his prior trustworthy conduct, and general good conduct. *Id.* at 365, 517 *A.*2d 378; *In re Kushner, supra,* 101 *N.J.* at 401, 502 *A.*2d 32; *In re Alosio, supra,* 99 *N.J.* at 88, 491 *A.*2d 628.

■ Each disciplinary proceeding is extremely fact-sensitive. While we do not make an independent examination of the underlying facts sustaining a criminal conviction, those facts are relevant to the nature of the discipline imposed. *In re Goldberg, supra,* 105 *N.J.* at 280, 520 *A.*2d 1147; *In re Kushner, supra,* 101 *N.J.* at 401, 502 *A.*2d 32.

II

Respondent was admitted to the bar in 1966. Prior to his involvement in this securities scheme, he had an unblemished professional career. He was a well-known, respected Morristown attorney who served for three years as a municipal court judge in Morristown. While his legal practice was generally sound, he testified that he never earned more than $48,000 per year.

In the late 1970s, defendant overextended himself financially. He purchased a condominium in Florida and a new home in Morris Township. In 1979 he also started to invest in stock options and quickly went into debt. As a result of these losses, combined with mortgage payments on the condominium and new house, the cost of private schools for his three children, and taxes due the Internal Revenue Service, respondent desperately needed money. At this time respondent began exploring new job leads, none of which proved fruitful. Deep-seated feelings of inferiority and unworthiness prevented respondent from discussing his need for money with his wife, his family, or his friends. Instead, he asked Stanley Buglione, an acquaintance, for a loan, and hence unintentionally began his involvement in this scheme.

■ Mr. Buglione stated he could not lend respondent money but instead proposed that respondent participate in a plan by

which $200,000 in bearer bonds would be sold. Although respondent was not told the securities were stolen, he realized that they were. Initially the stolen securities were delivered by Buglione, a member of the conspiracy, to a broker, another member of the conspiracy. The broker used his position at the Morristown office of a brokerage firm where he was employed to establish a brokerage account in the name of a fictitious person, "Lysa A. Jansen." From July 1983 until February 1984,[1] stolen securities were delivered to the account executive, who sold the stolen bonds through his firm and issued the brokerage firm's checks for the sale proceeds, payable to respondent under a power of attorney for "Lysa A. Jansen."

Respondent deposited these checks in his trust account. He would then distribute these funds by writing checks to himself and his co-conspirators, which they would cash. The conspiracy realized approximately $170,000. Respondent received between $20,000 to $25,000 for his part in the scheme.

On February 29, 1984, the FBI obtained a warrant to search respondent's law office in Morristown. Prior to the search, respondent advised the FBI that the records were not in his office but at his home. He voluntarily went to his home, retrieved the records, and gave them to the FBI. He then went to the United States Attorney's Office in Newark and fully confessed his involvement in the scheme. From that date, respondent fully cooperated with the government. His testimony before the federal grand jury led to the conviction of five individuals. Moreover, he agreed to a postponement of his own sentencing at the request of the government until the conclusion of other matters requiring his cooperation.

---

[1] Effective September 10, 1984, the Rules of Professional Conduct of the American Bar Association, as modified by this Court, govern the conduct of the members of the bar of this State. *R.* 1:14. Respondent's actions occurred prior to this date, and are consequently governed by the Disciplinary Rules then in force.

On March 29, 1984, respondent waived indictment and entered a plea of guilty to a one-count Information that charged him with conspiracy to receive and dispose of stolen securities in excess of $5,000. Respondent was given a two-year suspended sentence, five years probation, and 500 hours of community service. As a result of his sentence, he was suspended from the practice of law before the federal courts and on May 11, 1984, consented to be suspended from the practice of law in New Jersey.

### III

Generally there is no hard and fast rule that requires a certain penalty for the conviction of a certain crime. *In re Alosio, supra,* 99 *N.J.* at 89, 491 *A.*2d 628. We have, however, held that "[c]ertain types of ethical violations are, by their nature, so patently offensive to the elementary standards of a lawyer's professional duty that they *per se* warrant disbarment." *In re Conway,* 107 *N.J.* 168, 180, 526 *A.*2d 658 (1987). Prime examples are an attorney's knowing misappropriation of his or her client's funds, *In re Wilson,* 81 *N.J.* 451, 409 *A.*2d 1153 (1979), and criminal conduct that directly subverts and corrupts the administration of justice. *In re Verdiramo,* 96 *N.J.* 183, 186, 475 *A.*2d 45 (1984). Respondent's misconduct did not involve misappropriation of a client's funds or "directly poison the well of justice." *In re Verdiramo, supra,* 96 *N.J.* at 186, 475 *A.*2d 45. Accordingly, although respondent's misconduct was a serious crime of dishonesty, it does not *per se* merit his disbarment.

Each disciplinary proceeding is fact-sensitive and must be judged on its merits. Respondent readily admitted his participation in the crime. He did not, however, participate in the theft of the securities or in structuring the scheme. His criminal conduct was not like that of the attorneys who were disbarred in *In re Rigolosi,* 107 *N.J.* 192, 526 *A.*2d 670 (1987); *In re Conway, supra,* 107 *N.J.* at 168, 526 *A.*2d 658; *In re*

*Tuso,* 104 *N.J.* 59, 514 *A.*2d 1311 (1986), because of their participation in a bribery conspiracy that directly subverted the administration of justice.

Respondent did not act as attorney for the fictitious person "Lysa A. Jansen." Nonetheless the fact that he was an attorney was helpful to the scheme and considered an asset by his co-conspirators. Hence his criminal misconduct, while admittedly not as flagrant, is similar to that of the attorneys in the following cases, all of whom were disbarred: *In re Surgent,* 104 *N.J.* 566, 518 *A.*2d 215 (1986) (attorney previously suspended from practice of law for improperly executing jurats, improper involvement in business transaction and conflict of interest was disbarred after his conviction of conspiracy to commit theft of deception and fourteen felony offenses including conspiracy, stock fraud, sale of unregistered securities, and subornation of perjury); *In re Alosio, supra,* 99 *N.J.* at 84, 491 *A.*2d 628 (mastermind of scheme involving stolen high-priced cars pleaded guilty to one count of presenting false and fraudulent insurance claim and six counts of receiving stolen property, valued at approximately one-half million dollars); *In re Goldberg, supra,* 105 *N.J.* at 281, 520 *A.*2d 1147 (respondent actively used legal skills as attorney in criminal narcotics conspiracy by assisting and counselling drug dealer in narcotics negotiations and in investing and shielding proceeds from narcotics transactions from detection).

As mitigating factors, we are satisfied that respondent's conduct was aberrational. He has an otherwise unblemished record. He fully cooperated with the government, acknowledged the seriousness of his offenses, and accepted full responsibility for his actions.

Nonetheless, respondent's misconduct seriously detracted from the "honesty, integrity and dignity that are the hallmarks of the legal profession." *In re Mintz,* 101 *N.J.* 527, 536, 503 *A.*2d 290 (1986). He became involved in a protracted criminal conspiracy. He conspired to receive and sell stolen securities.

As the attorney in *In re Goldberg, supra,* 105 at 281, 520 *A*.2d 1147, respondent laundered and shielded funds from known criminal activities. Like Goldberg, he also was not an inexperienced attorney when he engaged in this conspiracy.

We conclude that respondent's criminal misconduct warrants disbarment. While we believe that respondent will not repeat the misconduct, his behavior in furthering a complex criminal scheme so impugned "the integrity of the legal system that disbarment is the only appropriate means to restore public confidence." *In re Hughes,* 90 *N.J.* 32, 36, 446 *A*.2d 1208 (1982) (where the Court recognized the substantial mitigating factors but nevertheless ordered that the attorney be disbarred).

Respondent is directed to reimburse the Ethics Financial Committee for appropriate administrative costs.

So ordered.

*For disbarment*—Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—5.

*Opposed*—None.

## ORDER

It is ORDERED that CARMINE P. LUNETTA of MORRISTOWN, who was admitted to the bar of this State in 1966, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that CARMINE P. LUNETTA be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with disbarred attorneys; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for appropriate administrative costs.