627 A.2d 162

IN THE MATTER OF LEONARD A. MESSINGER,
AN ATTORNEY AT LAW.

Argued March 17, 1992—Decided July 23, 1993.

*Richard J. Engelhardt,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Ronald G. Russo,* a member of the New York bar, argued the cause for respondent *(Leonard A. Messinger,* attorney).

## ORDER

It is ORDERED that LEONARD A. MESSINGER of NEW YORK, NEW YORK, who was admitted to the bar of this State in 1974, and who was temporarily suspended by this Court on March 22, 1989, and who remains suspended at this time, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that LEONARD A. MESSINGER be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that all funds, if any, currently existing in any New Jersey financial institution maintained by LEONARD A. MESSINGER, pursuant to *Rule* 1:21–6, shall be restrained from disbursement except upon application to this Court, for good cause shown, and shall be transferred by the financial institution to the Clerk of the Superior Court who is directed to deposit the funds in the Superior Court Trust Fund, pending further Order of this Court; and it is further

ORDERED that LEONARD A. MESSINGER comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with disbarred attorneys; and it is further

ORDERED that LEONARD A. MESSINGER reimburse the Ethics Financial Committee for appropriate administrative costs.

PER CURIAM.

This disciplinary proceeding comes before the Court on the application of the Office of Attorney Ethics (OAE) for final discipline based on respondent's criminal convictions on several serious federal charges. The Disciplinary Review Board (DRB or Board) rejected the OAE's request that the Board recommend that the Court disbar respondent, and instead unanimously recom-

mended that we suspend him for a period equal to respondent's suspension in New York and until he is restored to practice in that state. The OAE continues to press for disbarment. Our independent review of the record leads us to reject the Board's recommendation and to order that respondent's name be stricken from the rolls.

I

Respondent, Leonard Messinger, was admitted to the bar in New York in 1964 and in New Jersey in 1974. He began his career in his chosen area of tax law as an "Attorney Advisor" or law clerk to a judge of the United States Tax Court in Washington, D.C. After practicing as a tax associate at two Manhattan law firms, followed by a brief stint in New Jersey, respondent returned to New York in 1980, where he became a partner in the New York law firm of Goldschmidt Fredericks Kurzman & Oshatz, which in 1981 became Goldschmidt Fredericks & Oshatz. He remained with that firm until July 1985, at which time he became counsel to another Manhattan firm.

In December 1987 a federal grand jury in New York returned a sixteen-count indictment against respondent and his former law partner, Michael P. Oshatz. After a twelve-week trial a jury convicted respondent on the nine counts in which he was named, charging him with one count of conspiracy to defraud the United States by engaging in fraudulent securities transactions for the purpose of generating tax losses, a violation of 18 *U.S.C.A.* § 371; seven counts of aiding in the filing of false tax returns for various partnerships, contrary to 26 *U.S.C.A.* § 7206(2); and one count of filing a false personal income-tax return for calendar year 1981, a violation of 26 *U.S.C.A.* § 7206(1).

The evidence in the federal prosecution demonstrated that the conspiracy, which commenced in 1979, began as a joint effort of Edward Markowitz, who was the "mastermind," and his attorney, Michael Oshatz. Respondent did not join Oshatz's law firm until 1980, and although originally he was unaware of any nefarious

scheme that was being advanced by his practice, he became aware of the conspiracy in 1982 and, instead of "blowing the whistle," became a participant.

The nature of respondent's criminal conduct can best be gleaned from the Second Circuit's description of the fraudulent tax-shelter scheme that resulted in the convictions, in its August 1990 opinion affirming the trial court judgment, *United States v. Oshatz*, 912 *F*.2d 534.

Between 1979 and 1983, Oshatz, a tax attorney, assisted in the formation of a number of affiliated partnerships known as the "Monetary Group." The offering memoranda for the Monetary Group reported that the partnerships would invest in various financial instruments to secure economic gain, that these investments would involve substantial market risk, and that any losses generated by these transactions would be available as tax deductions. Oshatz and Messinger, his law partner, also formed a number of other partnerships, in which they held an interest, for the purpose of purchasing tax shelter investments from the Monetary Group.

The Monetary Group partnerships engaged primarily in two types of securities transactions on behalf of their limited partner investors. Initially, the partnerships entered into "straddle" transactions in which "short" and "long" positions are simultaneously established in a commodity or a security. At the end of the year, the side of the transaction with a loss is closed out, generating a tax deduction. At the beginning of the next year, the other "leg" of the transaction is closed out, generating a taxable gain. After Congress passed legislation curtailing the use of straddle transactions, (citation omitted), the partnerships entered into repurchase ("repo") agreements as investment vehicles. This type of arrangement involves the purchase of a security with borrowed money, with the security serving as collateral for the loan. In "open" repurchase agreements, the interest charge on the loan fluctuates with the prevailing market rate, entitling the investor to an interest expense deduction since a profit or loss may be realized on the transaction. Open repurchase agreements function much like straddle transactions since the interest on the loan may be deducted immediately, while the gain from the underlying security, generally a Treasury bill, is not realized until the next taxable year.

The Government offered convincing proof that the tax losses reported by the partnerships from these transactions were not the product of legitimate trading. Edward Markowitz, the head trader for the Monetary Group, testified that he falsified trade documents to reflect straddle transactions that never occurred. The partnerships also removed the risks associated with repurchase agreements by fixing the interest rate of the loan to coincide with the interest rate of the securities that collateralized the loan. Though this type of arrangement, known as a "repo to maturity" repurchase agreement, is legal, it provides no basis for claiming an interest expense deduction since no profit or loss can be realized in connection with the interest charges. To generate the desired tax losses, the partnerships financed repurchase agreements by using fixed "repo to maturity" rates but fraudulently documented the transactions as "open" repurchase agreements.

[*Id.* at 536.]

The trial court sentenced respondent to an aggregate prison term of twenty-eight months, to be followed by a probationary term of three years. Despite their length, the court's remarks in imposing sentence bear repeating here:

The conspiracy involved false, fictitious, phony transactions in the amount of 1.6 billion dollars, a staggering amount, to create phony tax losses of 225 million dollars to be passed on to rich taxpayers. Your crime is not a crime only against the government, but against every citizen who pays taxes regularly and honestly.

Lord Moten once said the test of a civilized society is its compliance with the unenforceable.

By your crimes, you have weakened the entire fabric of our society, extending from the defense of our nation to providing for the poor and the disadvantaged.

Not only did you cheat for your own benefit, but you permitted your own considerable skills and expertise to complement and complete the fraud designed by others. You were not the mastermind, but perhaps the most dangerous of all, the one with knowledge and capacity who goes along, perhaps to get along, and all too easily abandons principle for accommodation. Such lapses destroy the integrity of the market and the fabric of a just and principled society.

Perhaps if this sentence just involved you and your family, the outcome would be that you have suffered quite enough for the tormented acts which you committed.

Given your past history and your previously unblemished record, * * * I am sure you will never again violate your country's laws.

However, the betrayal of trust by a lawyer, by one who is entrusted by society with the enforcement of the rights of clients, and of all of us, betrays all of us who seek to establish a rule of law, so this sentence must act as a deterrent, as a statement of our society that its rules must be obeyed and that personal integrity must remain a paramount requirement for this society, particularly for the professionals who are responsible for the enforcement and the interpretation of our laws.

Following respondent's conviction this Court temporarily suspended him from the practice of law in New Jersey, which suspension remains in effect. The New York disciplinary authorities suspended respondent for a period of five years, retroactive to the date of his temporary suspension there, July 27, 1989, or for the combined period of his incarceration and probation, whichever is longer. Respondent began serving his prison term in November 1990 and was released in September 1991 after the sentencing court had granted his motion for reduction of sentence.

The DRB, concluded that "numerous compelling circumstances" militated against disbarment. The Board relied heavily on the New York disciplinary panel's conclusions and on the sentencing

court's observation, after it had imposed a custodial term, that if it were to "become[ ] appropriate at a future time because of your record and because of your capacity, I think reinstatement to the bar would be appropriate, because I believe that this sentence, together with the [criminal-prosecution] process that you have undergone, has punished and corrected as much as anyone could."

As enumerated in its Decision and Recommendation the Board gave weight to the following mitigating factors that both the sentencing court and the New York disciplinary panel had considered: (1) Respondent's strong sense of commitment to his family, his religious congregation, his community, and his friends, associates, and clients; (2) his acknowledgement of his wrongs; (3) his deep and sincere remorse for his illegal conduct; (4) the fact that respondent was not the mastermind of the fraudulent tax-shelter scheme but rather the follower of his senior partners' lead, despite his own qualms about the propriety of that conduct; (5) respondent's motivation for joining the illegal scheme apparently was not to increase his own personal wealth but instead to fulfill the legal assignments given to him by his senior partners; (6) his wrongdoing was the result not of venality or greed but rather of his reluctance to do battle with his law partners and, perhaps, to forfeit his job; (7) the considerable suffering and punishment for his misdeeds that respondent and his family have already endured; (8) the fact that respondent has been left virtually destitute as a result of the loss of his law practice and the costs of his criminal defense; (9) the confidence still reposed in him by his clients, associates, and employers; and (10) the conviction that respondent will never err again.

Based on the foregoing factors the DRB recommended that "respondent's suspension in New Jersey be equal to that imposed in New York and that respondent not be reinstated in this state until and unless he is restored to the practice of law in New York."

## II

We revisit some basic principles of general application. A criminal conviction is conclusive evidence of a disciplinary respon-

dent's guilt. *E.g.*, *In re Goldberg*, 105 *N.J.* 278, 280, 520 *A.*2d 1147 (1987). The disciplinary authorities and this Court have no need, therefore, to make an independent examination of the underlying facts to ascertain guilt. *In re Conway*, 107 *N.J.* 168, 169, 526 *A.*2d 658 (1987). Our task is limited to a determination of the appropriate discipline.

■ As the DRB observed, "Respondent's conviction clearly and convincingly shows that he has committed a criminal act that reflects adversely on his honesty and fitness as a lawyer, in violation of *RPC* 8.4(b). In addition, respondent's criminal conduct involved dishonesty, fraud, deceit, and misrepresentation, in violation of *RPC* 8.4(c)." Despite those circumstances, both respondent and the DRB would have us adopt the position of the New York hearing panel that a period of suspension is warranted. Respondent justifies that result on the basis that his involvement in the criminal conspiracy was not motivated by personal financial gain but rather "to fulfill the legal assignments given to him by his seniors at the Oshatz law firm"; that respondent played only a minor role in the fraudulent scheme; and, finally, that respondent's conduct amounted to an isolated incident of aberrational conduct.

We disagree. In support of his assertion that his involvement in the conspiracy was not motivated by personal gain, respondent argues, mistakenly, that "even the federal prosecutor who tried the criminal action * * * never made this claim." But as the criminal-sentencing transcript reveals, the Government prosecutor characterized respondent's offense as one "motivated exclusively by nauseating greed, committed by a gifted tax lawyer * * *." And in passing sentence the court observed that respondent had "cheat[ed] for [his] own benefit * * *." Finally, even accepting respondent's argument that he was not motivated by the opportunity to realize tax savings—which he did, to the tune of at least $23,000—but only by the wish to satisfy his senior partners, we would be hard pressed to conclude that respondent did not

connect keeping his senior partners happy with the anticipation of some personal improvement in his own financial position.

Respondent insists that his was but a minor role in the massive fraud that led to his conviction. But as the sentencing court observed, although respondent was not the mastermind, he was *"perhaps the most dangerous of all,* the one with knowledge and capacity * * *."* (Emphasis added.)

As against respondent's contention that his involvement in crime was episodic, we note that although he may not have been aware of the criminal conspiracy until 1982, the remaining counts of the indictment on which he was convicted charged criminal activity that had occurred between April 1982 and April 1983. Moreover, the criminal-trial jury was permitted to consider "similar acts" evidence of respondent's knowing involvement in a fraudulent trading scheme, not charged in the indictment, covering a period between 1980 and 1983. See *Oshatz, supra,* 912 *F.*2d at 541–43.

To a large extent our result in this case is guided by our decision in *In re Lunetta,* 118 *N.J.* 443, 572 *A.*2d 586 (1989). The respondent in that case pleaded guilty to a federal information charging him with knowingly and willfully conspiring to receive and dispose of $200,000 worth of stolen bearer bonds. *Id.* at 446–47, 572 *A.*2d 586. Lunetta used his trust account to distribute the proceeds of the sale of stolen securities to himself and his accomplices. The conspiracy realized $170,000, of which the respondent received $20,000 or $25,000. *Id.* at 447, 572 *A.*2d 586. Lunetta had no prior disciplinary infractions, did not participate in the theft of the securities or in structuring the scheme, readily admitted his participation in the crime, and testified against his five co-conspirators, thereby assisting in their conviction. Nevertheless, this Court ordered Lunetta disbarred for his involvement in what the Court described as a "protracted criminal conspiracy." *Id.* at 449, 572 *A.*2d 586. That conspiracy spanned a period of eight months—from July 1983 to February 1984. The comparisons of *Lunetta* with the proceedings before us make the outcome here almost *a fortiori.*

## III

Respondent's misconduct in advancing the purposes of a complex criminal scheme so impugned the integrity of the legal system as to require that he be disbarred. *See In re Zauber,* 122 *N.J.* 87, 583 *A.*2d 1140 (1991). Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs, including the costs of transcripts.

So ordered.

*For disbarment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.