704 A.2d 6

IN THE MATTER OF VICTOR M. MUSTO,
AN ATTORNEY AT LAW.

Argued October 21, 1997—Decided December 19, 1997.

*Richard J. Engelhardt,* Assistant Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*William B. Gallagher, Jr.,* argued the cause for respondent (*Klitzman & Gallagher,* attorneys; *Victor M. Musto,* pro se on the brief).

PER CURIAM.

■　This attorney disciplinary proceeding arises from a motion for final discipline, based upon a criminal conviction, filed by the Office of Attorney Ethics (OAE) before the Disciplinary Review Board (DRB) pursuant to *Rule* 1:20–13(c). The DRB concurred in the OAE recommendation that Victor M. Musto (respondent) be disbarred from the practice of law. The motion was based on

respondent's guilty pleas in federal and state courts to conspiracy to distribute cocaine; possession of methyl ecgonine, a metabolite of cocaine; conspiracy to possess heroin and cocaine; and possession of heroin and cocaine. *RPC* 8.4(b) states that it is professional misconduct for a lawyer to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects." In ethical proceedings, the conviction of a criminal offense conclusively establishes guilt of the offense charged. *In re Lunetta,* 118 *N.J.* 443, 445, 572 *A.*2d 586 (1989) (citing *R.* 1:20–6(b)(1)). In assessing the measure of discipline to be imposed, we may consider background facts and circumstances. *In re Spina,* 121 *N.J.* 378, 389, 580 *A.*2d 262 (1990). We draw those background facts and circumstances from presentence reports, plea agreements, and other reliable documentation surrounding the conviction.

## I

From the record in this case, the following background facts emerge. Respondent was admitted to the bar in 1983. He used drugs sporadically until 1991, when he began using heroin and cocaine heavily. He attributes his drug use to stress related to work, marital problems, his son's cerebral palsy, and his father's sickness.

At the time, respondent was practicing law in Asbury Park, New Jersey. His law partners were reportedly unaware of his drug use. Ultimately, respondent admitted his addiction to his employer and entered Clear Brook Manor, in Pennsylvania, for rehabilitation. Although he completed the program, he did not participate in a recommended follow-up plan and relapsed in 1992. In March 1993, when respondent increasingly missed deadlines and court appearances, his law firm accepted his resignation. Yet, despite his drug use, respondent was never the subject of any ethics complaints. His former law firm reported that "nothing in his addictions and his self infliction of harm [ ] caused any problems or difficulty to any clients."

In 1993, the FBI arranged for respondent's friend (whom we refer to as CW, the cooperating witness) to make a drug buy from respondent. Allegedly, CW became an FBI informant after having been arrested trying to import cocaine into the United States. The DRB report recites that local law enforcement agents told the FBI that respondent was selling cocaine and using the profits to purchase heroin. However, respondent states that CW was the source of any information concerning him. He claims that CW untruthfully told the FBI that respondent was selling cocaine because she had promised, as part of her arrangement, to produce evidence of corruption in New Jersey among public officials and learned professionals. Respondent contends that he was the only person whom CW implicated.

Pursuant to plan, CW began calling respondent regularly and stopping by his home. CW gained respondent's trust because CW and respondent had previously used drugs together. CW told respondent that she no longer had drug connections in New Jersey and needed his help to get cocaine. Although he purchased and used drugs for his own consumption, respondent was reluctant to provide CW with drugs. As she became more insistent and his own heroin addiction worsened, he agreed to act as her contact.

CW furnished the cash, and respondent purchased the following amounts of cocaine for her on three occasions: one ounce on June 29, 1993, four ounces on August 3, 1993, and two ounces on August 12, 1993. Respondent's three purchases for CW totalled $5,800. Respondent kept approximately $200 of the monies furnished by CW to buy heroin for himself. At the plea hearing for the federal charge, respondent gave the following factual basis for his plea of conspiracy to sell cocaine:

Q. Now, Mr. Musto, did you agree with FNU—I'm sure that means first name unknown—Medina and others to distribute up to 7 ounces of cocaine between June 29, 1993 and August 12, 1993 in Asbury Park, New Jersey and elsewhere?

A. Yes.

Q. Did you agree to distribute cocaine knowingly and intentionally?

A. Yes.

Q. Did you agree to distribute cocaine for money?

A. ... Originally I was hoping to make some money on it and I think in my statement eventually to the FBI it was very little money involved, but the idea was that I was going to make some money.

Q. That's what I mean, were you engaged in this activity with the intention at the time to try to profit from it?

A. Yes, I was.

The FBI conducted a surveillance of each of these transactions, recorded the conversations, and furnished the marked money used by CW to buy the cocaine. On August 12, 1993, the FBI seized respondent. He was questioned for five hours. He admitted selling cocaine. The FBI also asked him to act as an informant for political corruption, fraud, and drug operations in Monmouth County.

Respondent relapsed again. On October 22, 1993, local police found trace elements of cocaine in the pocket of respondent's jacket while searching patrons at an Asbury Park tavern incident to a search warrant. Respondent was arrested and released.

On October 25, 1993, local police stopped and arrested respondent while he was driving his car with two passengers. The two passengers had purchased and were in possession of heroin and cocaine that respondent intended to use. On October 27, 1993, respondent entered the Jersey Shore Addiction Service for rehabilitation. He was discharged on November 27, 1993.

After respondent's arrests on the state charges, federal authorities indicted respondent on January 6, 1994. The four-count indictment charged him with one count of conspiracy to distribute cocaine, in violation of 21 *U.S.C.A.* § 846, and three counts of distribution of cocaine, in violation of 21 *U.S.C.A.* § 841(a)(1). He pled guilty to the one count of conspiracy.

On February 14, 1994, state authorities indicted respondent for possession of methyl ecgonine, in violation of *N.J.S.A.* 2C:35–10a(1), for the October 22, 1993 tavern incident. On March 21, 1994, a Monmouth County Grand Jury indicted respondent for conspiracy to possess heroin and cocaine, in violation of *N.J.S.A.* 2C:5–2 and *N.J.S.A.* 2C:35–10, and possession of heroin and

cocaine, in violation of *N.J.S.A.* 2C:35–10a(1), for the October 25, 1993 incident.

As part of pre-trial services on the federal indictment, respondent entered Discovery House, a substance abuse facility in Marlboro, New Jersey, for ninety days from February to May 1994. Upon discharge, he entered aftercare with Prevention Specialists. When respondent relapsed in June 1994, he re-entered Discovery House for two weeks.

On September 23, 1994, pursuant to a plea agreement, respondent pled guilty to the federal charge of conspiracy to distribute cocaine. On April 7, 1995, a federal court sentenced respondent to a six-month custodial term and three-years of supervised release. Because respondent had cooperated with the FBI in its Monmouth County investigations, the federal court significantly reduced respondent's sentence under the Federal Sentencing Guidelines.[1]

Shortly after sentencing, respondent relapsed again. On April 19, 1995, local police observed respondent purchasing drugs. As respondent drove away with another man, the police attempted to pull him over, and respondent attempted to evade the police. The passenger threw the drugs (heroin) out of the window at respondent's request.

On April 25, 1995, respondent was indicted for possession of heroin and cocaine, eluding an officer, tampering with physical evidence, and hindering apprehension or prosecution.

The same day, pursuant to a plea agreement, respondent pled guilty to possession of methyl ecgonine, in violation of *N.J.S.A.* 2C:35–10a(1); conspiracy to possess heroin and cocaine, in viola-

---

[1] In support of the reduction motion, the Assistant U.S. Attorney said:

[T]he defendant has always made himself available whenever he has been requested to. The defendant has undergone a number of things in his life since the arrest which may be one of the better things that happened to him.... But he has confronted his drug use problem and while there have been a couple of slips, considering the length of time that drug use has gone on, from our prospective [sic], ... of receiving some information and cooperation from someone, he has been everything that we could ask.

tion of *N.J.S.A.* 2C:5–2 and *N.J.S.A.* 2C:35–10; and possession of heroin and cocaine, in violation of *N.J.S.A.* 2C:35–10a(1). The remaining charges were dismissed. On April 28, 1995, the court sentenced respondent to three concurrent four-year terms of imprisonment and ordered him to pay other penalties and fees.

Respondent served his federal sentence from May 1995 to October 27, 1995 during which time he completed an intensive drug program and attended Alcoholics Anonymous (AA) meetings. Respondent served his state sentence from October 27, 1995 until September 11, 1996. He attended both AA and Narcotics Anonymous (NA) meetings during that time.

Respondent is currently on federal probation and will remain on that status until October 1998. Respondent has been attending both group and individual counseling three times weekly with Prevention Specialists. Likewise, respondent has random urine drug screening twice weekly. The results of all of respondent's tests have been negative. He also has an AA sponsor and attends AA meetings at least three times a week.

Respondent did not notify OAE of the charges against him, as required by *Rule* 1:20–13(a)(1). Respondent's arrest was discovered through a newspaper article. On June 15, 1995, respondent was temporarily suspended pursuant to *Rule* 1:20–13(b). *In re Musto*, 140 *N.J.* 520, 659 *A.*2d 469 (1995). The suspension remains in effect.

## II

A criminal conviction is conclusive evidence of guilt in a disciplinary proceeding. *R.* 1:20–13(c)(1); *In re Magid*, 139 *N.J.* 449, 451, 655 *A.*2d 916 (1995); *In re Principato*, 139 *N.J.* 456, 460, 655 *A.*2d 920 (1995). Respondent's federal conviction for conspiracy to distribute cocaine and state convictions for conspiracy to possess heroin and cocaine, possession of methyl ecgonine, and possession of heroin and cocaine, therefore, establish his violation of *RPC* 8.4(b). Pursuant to *RPC* 8.4(b), it is professional misconduct for an attorney to "commit a criminal act that reflects

adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer." Hence, the sole issue is the extent of discipline to be imposed. *R.* 1:20–13(c)(2); *Magid, supra,* 139 *N.J.* at 451–52, 655 *A.*2d 916; *Principato, supra,* 139 *N.J.* at 460, 655 *A.*2d 920; *Lunetta, supra,* 118 *N.J.* at 445, 572 *A.*2d 586.

■■■■ As we have indicated previously, "[i]n determining appropriate discipline, we consider the·interests of the public, the bar, and the respondent. The primary purpose of discipline is not to punish the attorney but to preserve the confidence, of the public in the bar." *Principato, supra,* 139 *N.J.* at 460, 655 *A.*2d 920 (citations omitted). Fashioning the appropriate penalty involves a consideration of many factors, including the "nature and severity of the crime, whether the crime is related to the practice of law, and any mitigating factors such as respondent's reputation, his prior trustworthy conduct, and general good conduct." *Lunetta, supra,* 118 *N.J.* at 445–46, 572 *A.*2d 586.

■■■■ We will not excuse an ethics transgression or lessen the degree of punishment because an attorney's conduct did not involve the practice of law or arise from a client relationship. *In re Schaffer,* 140 *N.J.* 148, 156, 657 *A.*2d 871 (1995). Offenses that evidence ethical shortcomings, although not committed in the attorney's professional capacity, may, nevertheless, warrant discipline. *In re Hasbrouck,* 140 *N.J.* 162, 167, 657 *A.*2d 878 (1995). The obligation of an attorney to maintain the high standard of conduct required by a member of the bar applies even to activities that may not directly involve the practice of law or affect his or her clients. *Schaffer, supra,* 140 *N.J.* at 156, 657 *A.*2d 871 (citing *In re Suchanoff,* 93 *N.J.* 226, 230, 460 *A.*2d 642 (1983); *In re Rutledge,* 101 *N.J.* 493, 498, 502 *A.*2d 569 (1986); *In re Huber,* 101 *N.J.* 1, 4, 499 *A.*2d 220 (1985); *In re Franklin,* 71 *N.J.* 425, 429, 365 *A.*2d 1361 (1976)).

An attorney who breaks criminal laws relating to controlled dangerous substances commits ethical infractions that demonstrate a disrespect for the law, denigrate the entire profession, and destroy public confidence in the practicing bar. *Id.* at 159,

657 A.2d 871. We have determined that offenses attributable to drug addiction warrant strong disciplinary measures.

## A.

■ A three-month suspension is a generally appropriate measure of discipline for possessory crimes related to controlled dangerous substances (CDS). *See id.* at 161, 657 A.2d 871 (ordering a three-month suspension for unlawful possession of a CDS, unlawful possession of drug paraphernalia, being unlawfully under the influence of a CDS, and possession of a CDS in a motor vehicle); *In re Benjamin,* 135 N.J. 461, 462, 640 A.2d 845 (1994) (ordering a three-month suspension for unlawful possession of cocaine and marijuana); *In re Karwell,* 131 N.J. 396, 399, 620 A.2d 1048 (1993) (ordering a three-month suspension for possession of 0.08 grams of marijuana, 0.13 grams of cocaine, and drug paraphernalia); *In re Sheppard,* 126 N.J. 210, 211, 594 A.2d 1333 (1991) (ordering a three-month suspension for possession of under 50 grams of marijuana and for failure to deliver a CDS (cocaine) to a law enforcement officer); *In re Nixon* 122 N.J. 290, 290, 585 A.2d 322 (1991) (ordering a three-month suspension for possession of marijuana and cocaine).

■ Some offenses attributable to drug addiction may warrant stronger disciplinary measures. *See In re Stanton,* 110 N.J. 356, 357, 360, 541 A.2d 678 (1988) (ordering a six-month suspension for possession of cocaine where attorney had acknowledged ten years of drug abuse); *In re Pleva,* 106 N.J. 637, 647, 525 A.2d 1104 (1987) (ordering a six-month suspension of attorney for pleading guilty to possession of nine and one-half grams of cocaine, eleven grams of hashish, and fifty-two grams of marijuana where attorney was regular drug user and had been arrested previously; three-month sentence warranted for guilty plea to charge of giving false information about drug use when completing certification required before purchasing firearm); *In re Kaufman,* 104 N.J. 509, 514, 518 A.2d 185 (1986) (ordering a six-month suspension of attorney for pleading guilty to two separate criminal indictments

for possession of cocaine and methaqualude where attorney had prior drug-related incident and a long history of drug abuse); *In re Orlando*, 104 *N.J.* 344, 352, 517 *A.*2d 139 (1986) (suspending attorney who pled guilty to one count indictment for possession of cocaine until such time as could demonstrate fitness where attorney was seeking psychological help for depression).

■ The Court has imposed longer sentences in drug-related offenses that also involved dishonest, fraudulent, and deceptive conduct. *Hasbrouck, supra,* 140 *N.J.* at 172, 657 *A.*2d 878 (imposing one-year suspension on attorney for pleading guilty to criminal charges where the attorney was forging false prescriptions for darvocet and vicodin for seven years); *In re McCarthy*, 119 *N.J.* 437, 575 *A.*2d 434 (1990) (imposing suspension on attorney convicted of distribution of a CDS and obtaining a *CDS* by misrepresentation, fraud, forgery, deception, or subterfuge until attorney could demonstrate fitness). A longer sentence is warranted under those circumstances because dishonest conduct particularly " 'impugns the integrity of the legal system' and destroys 'public trust and confidence' in the law and the legal system." *Hasbrouck, supra,* 140 *N.J.* at 168, 657 *A.*2d 878 (citations omitted).

■ Respondent's state convictions for possession of cocaine and heroin, conspiracy to possess heroin and cocaine, and possession of methyl ecgonine establish that he engaged in criminal acts that reflected adversely on his fitness to practice law, in violation of *RPC* 8.4(b). Because suspension is appropriate for possessory crimes, standing alone, these convictions would warrant a substantial period of suspension.[2] *See Kaufman, supra,* 104 *N.J.* at 513,

---

[2] Moreover, disbarment is appropriate where the attorney has misappropriated client funds to fund the attorney's drug addiction. In those circumstances, the attorney's drug or alcohol addiction will not constitute a mitigating factor to overcome the presumption of disbarment. *See In re Ryle*, 105 *N.J.* 10, 12–13, 518 *A.*2d 1103 (1987)(attorney disbarred for appropriating approximately $2,240 of client funds notwithstanding defense of alcoholism); *In re Hein*, 104 *N.J.* 297, 303–04, 516 *A.*2d 1105 (1986)(attorney disbarred for neglect of clients' matters, misrepresentation of status of matters, and misappropriating approximately

518 *A*.2d 185 ("It is that fact—two offenses in four months—that most strongly influences [the] conclusion that a [six-month] period of suspension is warranted.").

## B.

 Critical to our decision, then, are the circumstances that surround the federal conviction. "In most cases an attorney convicted of distribution of controlled dangerous substances would be disbarred. Disbarment would certainly be appropriate if the distribution were done for gain or profit." *In re Kinnear,* 105 *N.J.* 391, 396, 522 *A*.2d 414 (1987). Accordingly, we have disbarred attorneys who engaged in wide-ranging conspiracies to distribute controlled dangerous substances for financial gain. *In re Goldberg,* 105 *N.J.* 278, 283, 520 *A*.2d 1147 (1987).

In *Goldberg,* the attorney knowingly participated in an extensive narcotics conspiracy with a known drug dealer and fugitive. *Id.* at 280, 520 *A*.2d 1147. He took steps to invest and shield the proceeds of the narcotics transactions. *Id.* at 281, 520 *A*.2d 1147. The Court disbarred him.

> By his voluntary and knowing participation in a conspiracy to distribute and to possess with intent to distribute a controlled narcotic substance, respondent has failed to uphold the minimum standards of honesty, uprightness, and fair dealing of a member of the bar. The conspiracy evidenced continuing and prolonged, rather than episodic, involvement in crime. The object of the conspiracy constituted a direct threat to society, as well as the indirect, albeit real, harm to persons who eventually would be mired in drugs. The crime quite obviously involved dishonesty, deceit and a contempt for law. Moreover, respondent was motivated by

---

$1,400 of client funds notwithstanding defense of alcoholism); *In re Romano,* 104 *N.J.* 306, 311, 516 *A*.2d 1109 (1986)(attorney disbarred for misappropriating thousands of dollars of client funds to support drug habit); *In re Monaghan,* 104 *N.J.* 312, 313, 516 *A*.2d 1113 (1986)(disbarment for misappropriating client funds as result of alcohol use); *In re Canfield,* 104 *N.J.* 314, 315, 516 *A*.2d 1114 (1986)(disbarment for misappropriating client funds as result of alcohol use); *In re Jacob,* 95 *N.J.* 132, 137–38, 469 *A*.2d 498 (1984) (alcoholism unavailing as a mitigating factor so as to forestall disbarment in misappropriation case absent "competent medical proofs that respondent suffered a loss of competency, comprehension or will of a magnitude that could excuse egregious misconduct that was clearly knowing, volitional and purposeful").

personal greed, and further, he used his professional status and skills as a lawyer to assist in the engineering of the criminal scheme.

[*Id.* at 283, 520 *A.*2d 1147.]

In *In re McCann*, 110 *N.J.* 496, 541 *A.*2d 1361 (1988), the attorney participated in a large-scale and prolonged criminal narcotics conspiracy that involved the purchase of large quantities of cocaine in various South American countries. He arranged to smuggle the cocaine into the United States by truck, automobile, ship or airplane. *Id.* at 498–99, 541 *A.*2d 1361. He was sentenced to an aggregate term of life imprisonment without parole. *Id.* at 499, 541 *A.*2d 1361. We disbarred him because he contrived and actively participated in a large-scale conspiracy. His misconduct and convictions established an involvement in dishonest, fraudulent, and deceitful practices that adversely reflected on his fitness to practice law. *Id.* at 501–02, 541 *A.*2d 1361.

An attorney who sold more than a pound of cocaine to a police informant for $11,500 was disbarred in New Jersey following disbarment and incarceration in New York. *In re Valentin*, 147 *N.J.* 499, 501, 688 *A.*2d 602 (1997). There, we agreed with the DRB's recommendation because Valentin's distribution of controlled substances for financial gain adversely reflected on his ability to practice law. *Id.* at 503–04, 688 *A.*2d 602.

Nonetheless, disbarment does not automatically result from a distribution conviction. In *Kinnear, supra,* 105 *N.J.* at 392, 522 *A.*2d 414, we disciplined an attorney after he pleaded guilty to one count of distribution of a CDS. The attorney "shared or gave" 1.35 grams of cocaine to an undercover narcotics agent, his purported good friend, who claimed he was unable to secure drugs. *Ibid.* As a result of his plea, the attorney was placed on probation for three years and was directed to continue outpatient treatment. *Id.* at 393, 522 *A.*2d 414. In considering the discipline to impose, we weighed the following factors: the nature and severity of the crime, the relationship of the crime to the practice of law, the reputation of the respondent, and his prior conduct and character. *Ibid.* We imposed a one-year suspension because Kinnear was primarily an addict whose misconduct was limited to one episode,

was unrelated to the practice of law, and was unlikely to recur. *Id.* at 396–97, 522 *A.*2d 414.

Obviously, respondent's case falls between *Kinnear* and *McCann.* Respondent is not a one-time offender, nor is he a kingpin in a drug cartel. His case, like every disciplinary case, is fact-sensitive. *Hasbrouck, supra,* 140 *N.J.* at 167, 657 *A.*2d 878 (citing *Kinnear, supra,* 105 *N.J.* at 395, 522 *A.*2d 414; *In re Litwin,* 104 *N.J.* 362, 366, 517 *A.*2d 378 (1986)). Respondent's drug-related convictions are very serious transgressions and "evidence[ ] a public judgment that places in question the lawyer's integrity and respect for the law." *Kaufman, supra,* 104 *N.J.* at 513–14, 518 *A.*2d 185.

## III

The three state charges are for possession or conspiracy to possess small amounts of drugs for personal use. The last possession incident occurred when respondent relapsed days before he was scheduled to be imprisoned. These state charges would ordinarily not warrant disbarment. The decisive question is what discipline is required for the federal offense. Our independent review of the record leads us to conclude that suspension, not disbarment, is the appropriate discipline for respondent on the federal conspiracy charge. Respondent admitted that he distributed cocaine to CW on three occasions and consequently pled guilty to conspiracy to distribute cocaine.

We note that there has been no other ethical infraction in his twelve-year legal career. Respondent's misconduct did not harm his clients. He was able to meet his professional obligations while he spiraled down the path of drug addiction. Unlike the attorney in *Goldberg,* who used his skills as an attorney to engineer a criminal scheme, respondent's misconduct did not relate to the practice of law, nor did he use his professional status or skills as an attorney to assist in his criminal acts. He was not practicing law at the time of the activities leading to his arrests.

Respondent's conduct was significantly different from the egregious conduct of the attorneys in *McCann* and *Goldberg,* who participated in extensive criminal narcotics conspiracies solely for profit. Respondent did not intend his sales to CW to result in public distribution because the cocaine was purportedly for CW's personal use. CW used their former relationship to persuade him to procure drugs for her when she was ostensibly unable to do so. Moreover, while respondent's misconduct occurred over a five-month period (except for the final 1995 arrest, which followed his federal sentencing), his criminal activity was episodic and not part of a prolonged enterprise. As in *Kinnear,* we conclude that the circumstances leading to respondent's federal conviction (the distribution of cocaine at the request of his ex-friend) are unlikely to recur.

Respondent did distribute substantial amounts of cocaine on the three separate occasions involving CW, and disbarment would generally be appropriate if the distribution were for gain or profit. *Kinnear, supra,* 105 *N.J.* at 396, 522 *A.*2d 414. As in *Kinnear,* however, respondent was primarily a drug user. Respondent's cocaine sales were profit-related only to the extent that he used the $200 to feed his heroin addiction.

Obviously, respondent's conduct was more serious than that in *Kinnear* because it occurred on several separate occasions and involved a greater amount of drugs. Nonetheless, we are influenced by the mitigating factors involved in this case. As revealed at his federal sentencing hearing, respondent cooperated with the FBI after his sales of cocaine, and his cooperation provided information about the involvement of persons in the drug trade.

We unequivocally condemn the use of illegal drugs by attorneys. We do, however, consider bona fide efforts at rehabilitation in deciding the appropriate discipline. In *Hasbrouck, supra,* we noted:

> We recognize the grave affliction that besets those stricken by the disease of addiction and acknowledge that lawyers are not insulated from the expansive reach of this illness. We appreciate also the difficult path of treatment and self-

deprivation that must be traveled on the way to recovery. This Court looks to aid attorneys who attempt to better their lives by seeking help and eventual recovery.

[140 *N.J.* at 170, 657 *A.*2d 878 (citation omitted).]

Accordingly, in *Schaffer, supra,* 140 *N.J.* at 157, 161, 657 *A.*2d 871, we considered as a mitigating factor the attorney's consistent attempts to address his addiction after his arrest, including participation in a drug and alcohol rehabilitation program and regular attendance at AA meetings. We also authorized a new form of discipline, accelerated suspension, for attorneys whose drug addiction contributed to the commission of a possessory drug offense, but who have conscientiously, promptly, successfully achieved rehabilitation. We have cooperated with the New Jersey State Bar in its efforts to conduct a Lawyers Assistance Program to help lawyers with substance abuse problems combat their affliction.

Respondent twice attempted to address his addiction *prior* to his arrests, first in 1991 when he voluntarily entered Clear Brook Manor, and also in 1993 when he entered the Marwarth Clinic. Respondent's own appreciation of his dependency, not the threat of discipline, convinced him to seek help for his addiction.

Respondent did address, albeit unsuccessfully, his addiction after his arrests. In October 1993, respondent voluntarily entered the Jersey Shore Addiction Service for a thirty-day detoxification and rehabilitation program, from which he was satisfactorily discharged. As part of pre-trial services on the federal indictment, respondent entered the Discovery House, and he continued with therapy post-discharge. When he relapsed in August 1993, he re-entered Discovery House for two weeks. While serving his prison terms, respondent completed an intensive drug program and attended both AA and NA meetings. Like almost every person addicted by compulsive disorder, respondent had to hit bottom before he started up. Had his drug dependency led to theft of client funds or genuine involvement in organized criminal distribution of drugs, he would be disbarred.

Respondent has continued to address his addiction since his release from prison. Respondent has been attending both group and individual counseling three times weekly. Likewise, respondent has random urine drug screening twice per week, all of which have been negative. He also has an AA sponsor and attends AA meetings at least three times a week. Respondent, who has expressed deep remorse over the embarrassment he has caused his family and the bar, has been substance-free since May 1995. His former employer, who commendably undertook to represent respondent in these ethical proceedings, represents to us that respondent has remained drug-free.

We conclude that respondent was primarily a drug user; that he did not seek to profit from his activities; that his misconduct did not relate to the practice of law; that his act of distribution is unlikely to recur; that he cooperated with federal agents; and that respondent confronted his addiction *before* and *after* he was arrested. Given his efforts to rehabilitate himself, we are left short of the conclusion that respondent's ethical violations reflect a defect in professional character so grave as to require disbarment.

Respondent's misconduct warrants strong disciplinary measures because it calls into question an attorney's respect for the law.

We order that respondent be suspended from the practice of law for a period of three years, effective June 15, 1995, the date of his suspension. In order to preserve the public's confidence in the legal profession, we affix stringent conditions on respondent's return to practice. We require that respondent continue in any course of counseling that is professionally recommended as long as necessary, including any necessary testing. Finally, respondent's readmission shall also be contingent on his working in a supervised capacity until otherwise ordered by the DRB on suitable application.

Respondent shall reimburse the Disciplinary Oversight Committee for appropriate administrative costs.

So Ordered.

*For Suspension*—Chief Justice PORTIZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.

### ORDER

It is ORDERED that **VICTOR M. MUSTO** of **ASBURY PARK**, who was admitted to the bar of this State in 1983, be suspended from the practice of law for three years and until further Order of the Court, retroactive to June 15, 1995; and it is further

ORDERED that during his suspension, respondent shall continue in a course of counseling that is professionally recommended as long as necessary, including any necessary testing; and it is further

ORDERED that on his reinstatement, respondent shall practice law only under the supervision of a practicing attorney until otherwise ordered by the Disciplinary Review Board on suitable application; and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State; and it is further

ORDERED that respondent be restrained and enjoined from practicing law during the period of his suspension and that he continue to comply with *Rule* 1:20–20; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter.